On Application for Rehearing

WINDOM, Judge.
This Court’s opinion of June 25, 2010, is withdrawn, and the following opinion is substituted therefor.
Evan Miller appeals his conviction of murder made capital because it was committed during the course of an arson, see § 13A-5-40(a)(9), Ala.Code 1975, and his resulting sentence of life in prison without the possibility of parole. For the reasons that follow, this Court affirms Miller’s conviction and sentence.
The evidence presented at trial established that in July 2003, then 14-year-old *683 Evan Miller and his 16-year-old codefen-dant, Colby Smith, robbed and savagely beat Miller’s neighbor, Cole Cannon.[1] After beating Cannon to the point that he could not get off the floor, Miller set Cannon’s trailer on fire. Cannon’s body was later discovered by firefighters, who were called to extinguish the fire.
Colby Smith testified that he became acquainted with Miller during high school and that they had known each other for approximately four or five months before the crime. (R. 979.) On the evening of July 15, 2003, Smith was spending the night at Miller’s trailer. Around midnight, Cannon came over complaining that he had burned his food and asking if they had something he could eat. Cannon appeared to have been drinking, and Smith smelled alcohol on his breath and noticed that he was “staggering.” (R. 710, 980.) While Miller’s mother was preparing some spaghetti for Cannon, Miller and Smith went over to Cannon’s trailer to look for drugs, but they were unable to find any. The two, however, found and stole some of Cannon’s baseball trading cards. Miller and Smith then returned to Miller’s trailer.
When Cannon finished eating, he returned to his trailer. Miller and Smith then went back to Cannon’s trailer intending to get Cannon intoxicated and to steal his money. Miller and Smith smoked a joint and played drinking games with Cannon until he passed out on the couch. While Cannon was unconscious, Miller stole Cannon’s wallet and took it into the bathroom where he split a little over $800 with Smith. While Miller was attempting to put the wallet back in Cannon’s pocket, Cannon jumped up and grabbed Miller around the throat. Smith, who witnessed the altercation, grabbed a baseball bat and hit Cannon on the head. Miller then climbed onto Cannon and began hitting him in the face with his fists. Despite Cannon’s pleas to stop, Miller picked up the bat, which Smith had dropped, and continued to attack Cannon by striking him with it repeatedly.
Afterwards, Miller placed a sheet over Cannon’s head and told him, “I am God, I’ve come to take your life.” (R. 986.) After Miller hit Cannon a final time with the bat, Miller and Smith returned to Miller’s trailer. A few minutes later, however, Miller and Smith returned to Cannon’s trailer and attempted to clean up the blood. Afterwards, Miller and Smith set several fires to cover up their crime. Initially, Smith used a lighter to start a fire on a couch in the back bedroom, while Miller set another fire on a different couch “to cover up the evidence.” (R. 990.) As they were leaving, Smith saw Cannon “[j]ust laying there.” Feeling sorry for Cannon, Smith placed a towel under his head in an attempt to stop the bleeding. Smith also turned on the faucet in the kitchen sink and stopped it up, hoping that the water would extinguish the fires. As they were leaving Cannon’s trailer, Smith heard Cannon asking, “Why are /all doing this to me?” (R. 990-91.) Approximately 10 minutes later, Smith returned to Cannon’s trailer alone. He could hear Cannon coughing but “smoke was coming out and [Miller was] coming behind [him,]” so he returned to the Miller’s trailer. (R. 992.)
Firefighters, who were called to the trailer park to extinguish the fire at Cannon’s trailer, noticed blood on the coffee table and blood spatters on the wall. This led the firefighters to the discovery of Cannon’s body in the hallway leading to *684 the back bedroom. Fire Marshal Richard Montgomery, who conducted the initial investigation, concentrated on the north bedroom where most of the damage from the fire occurred. The investigation was later turned over to Investigator Tim Sandlin of the Sheriffs Department after Fire Marshal Montgomery indicated that the fire was “obviously suspicious.” (R. 796, 798-802.) After talking with Cannon’s family members, Investigator Sandlin became aware that certain items, including Cannon’s wallet and some trading cards, were missing from the trailer. Cannon’s wallet was eventually recovered from underneath the couch in his trailer, but his driver’s license was missing. Investigator Sandlin also removed a baseball bat from underneath the couch.
After this discovery, Investigator Sand-lin went to Miller’s trailer to speak with Miller and his mother, Susan. Susan gave Investigator Sandlin a box of trading cards, and Miller and his mother agreed to ride with him to the sheriffs office to give statements.
At the sheriffs office, Investigator Sand-lin obtained basic information from Miller and read him his rights from the juvenile Miranda form, which Miller and his mother both signed before Miller began recounting the events of the night of July 15 and the early morning of July 16. In his statement, Miller initially told Investigator Sandlin that on the evening of July 15, he was at his trailer watching a movie. Although he admitted that Cannon came over to their trailer, he denied going over to Cannon’s trailer. Miller also claimed that he did not learn about the fire at Cannon’s trailer until the fire department arrived the next morning. However, when Investigator Sandlin asked Miller to begin by describing the morning’s events and work backwards to the previous evening, Miller became “frustrated and agitated” and told Investigator Sandlin “to forget all that, that that wasn’t true.” (R. 706-07.) Miller then requested that everyone except Investigator Sandlin leave the room. After Miller’s mother and juvenile officers left the room, Miller gave Investigator Sandlin another statement, which Sandlin typed up for Miller to read and sign.
In his second statement, Miller explained that, on the evening of July 15, his family was getting ready to go to bed when Cannon came over to use the telephone. While Cannon was at his trailer, Miller went over to Cannon’s trailer where he found some trading cards that “looked like they were worth money.” (R. 710.) When Cannon came back to the Millers’ trailer around midnight to get something to eat, Miller went to Cannon’s trailer to get the cards. Around 2:00 or 3:00 a.m., Miller and Smith returned to Cannon’s trailer to drink beer. According to Miller, as the evening progressed, Cannon became so intoxicated that he had trouble standing and eventually fell down, hitting his nose and lip on the table. Miller stated that when he tried to assist Cannon, Cannon grabbed him by the throat. Miller said Smith pushed Cannon off of him just as Cannon grabbed a bat and hit Miller on the arm. Smith then grabbed the bat from Cannon and hit Cannon on the arm. Afterwards, Smith threw the bat down and Miller kicked it under the couch. Miller then punched Cannon several times in the face before seeing Cannon’s wallet on the floor and taking about $300 in cash and a driver’s license. After hearing Miller’s mother knock on the front door and tell them that the police were on the way, Miller and Smith ran out the back door. As they were leaving, they could hear Cannon asking, “Why did you do this to me?” (R. 711-12.)
Based on Miller’s statement, Investigator Sandlin called Deputy Fire Marshal *685 Lyndon Blaxton to let him know that he had “additional information” on the fire. (R. 806.) As a result, Deputy Blaxton, Investigator Sandlin, and other law-enforcement agents agreed to meet at Cannon’s trailer on July 24, 2003, to conduct a full fire investigation. During the investigation, Deputy Blaxton noticed blood spatters on the wall, a table, a pillow, and a towel. (R. 807-08.) Deputy Blaxton also identified four points of origin for the fires, including a large one in the south bedroom, which spread down the hallway; a second one on the bed, which had been completely consumed by fire; a third one on the couch; and a fourth one, which originated from a cushion that had been placed on the floor before being set on fire.
Forensic pathologist Dr. Adam Craig performed the initial external examination on Cannon’s body. Because he claimed there was no indication that Cannon’s death had resulted from a crime, Dr. Craig did not perform a full autopsy, and he initially ruled that Cannon’s death was an accident caused by the inhalation of smoke and soot. After further investigation, however, Investigator Sandlin requested that Cannon’s body be exhumed so that a full autopsy could be performed. On August 1, 2003, Dr. Craig performed a full autopsy and discovered several injuries not caused by the fire, including a two-inch contusion to the left side of the forehead caused by blunt force and six rib fractures on both sides of the body. Dr. Craig was also able to determine from hemorrhaging that these injuries occurred before Cannon died. Toxicology analysis showed Cannon’s blood-alcohol level to be .216. Based upon these findings, Dr. Craig reaffirmed his initial finding that the cause of Cannon’s death was “inhalation of products of combustion,” but added that “multiple blunt force injuries and ethanol intoxication” were contributing factors that made it more difficult for Cannon to breathe in the fire or to escape from the burning trailer. (R. 939-40.)
Deputy Tim McWhorter of the Lawrence County Sheriffs Department testified that on July 31, 2003, and August 4, 2003, he transported Miller from the Tennessee Valley Detention Center to two different mental-health evaluations. Deputy McWhorter stated that although he engaged in “small talk” with Miller, he did not interrogate him, talk about the murder investigation, threaten him, or offer Miller any benefit for making a statement. During their first trip, Miller asked Deputy McWhorter “if he had previously told something that wasn’t true but now wanted to go back and tell the truth, would he get in any trouble.” Miller also told Deputy McWhorter that he deserved “to do some time in a correctional facility, that he was not innocent and he had been involved in the assault on Mr. Cole Cannon.” (R. 871.) Similarly, during their August 4 trip, Miller told Deputy McWhorter that he “had been really messed up” when Cannon died, because he had taken two Klono-pin tablets and had drunk most of a fifth of whiskey. (R. 873.) Miller stated that he and Smith went to Cannon’s trailer after Cannon told them that he had some “acid,” but when they got there, Cannon refused to discuss anything but music. When they attempted to leave, Cannon grabbed Miller by the neck. Miller then “slammed Mr. Cannon really hard” because he was “really pissed off.” Miller knew that the autopsy would have revealed marks and bruises because “they had roughed him up pretty good.” Miller said that he could not remember everything, but “the more he thought about it, the more it made him think he started the fire.” (R. 874.) The following morning, Smith told Miller that Cannon had died in the fire.
Nancie Jones, the head of the DNA section of the Huntsville Regional Labora *686 tory of the Alabama Department of Forensic Sciences, testified that she examined numerous items for the presence of DNA. Several items, including an aluminum bat, a towel, and a portion of a gold cushion tested positive for human blood, but Jones was unable to obtain usable DNA profiles from the blood on the bat or the towel. Jones was able to use the blood taken from the gold cushion to create a DNA profile, which was consistent with the DNA sample taken from Cannon during the autopsy. Jones was also able to exclude both Miller and Smith as sources for the DNA found on the cushion. The bloodstains from the wall in Cannon’s trailer were also consistent with Cannon’s DNA profile and inconsistent with Miller’s and Smith’s DNA profiles. Jones also found bloodstains consistent with Miller’s DNA profile on an Old Navy brand t-shirt and on the underarm portion of a Hanes brand t-shirt. Jones could not exclude Cannon as a second source of blood on the Hanes t-shirt; however, the blood spatters on the shirt were consistent with someone being hit with an object rather than being shot with a gun.
I.
Miller first argues that his sentence of life in prison without the possibility of parole for the capital offense of murder during an arson is disproportionate and thus violates the Eighth Amendment to the United States Constitution. Specifically, Miller argues that the State may not, consistent with the Eighth Amendment, sentence an individual who was 14 years old at the time of the crime to life in prison without the possibility of parole. Miller relies on the holding of Supreme Court of the United States in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), to support his proposition that 14-year-olds are categorically prohibited from being sentenced to life in prison without the possibility of parole for capital murder. For the reasons that follow, this Court rejects Miller’s argument.
In Graham v. Florida, — U.S. —, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the Supreme Court of the United States explained that generally there are two classifications of proportionality challenges to sentences. “The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case.” Graham, — U.S. at -, 130 S.Ct. at 2021. Under this approach, courts must determine “whether a sentence for a term of years is grossly disproportionate for a particular defendant’s crime.” Graham, — U.S. at-, 130 S.Ct. at 2022.
“The second classification of cases has used categorical rules to define Eighth Amendment standards.” Id. “Th[is] classification in turn consists of two subsets, one considering the nature of the offense, the other considering the characteristics of the offender.” Id. Under the categorical challenge to a sentence:
“[c]ourt[s] [must] first consider[ ] objective indicia of society’s standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the [cjourt’s own understanding and interpretation of the Eighth Amendment’s text, history, meaning, and purpose, [c]ourt[s] must determine in the exercise of [their] own independent judgment whether the punishment in question violates the Constitution.”
Id. (internal citations and quotations omitted).
Here, Miller raises only a categorical challenge to his sentence of life in prison *687 without the possibility of parole.[2] Specifically, Miller argues that “a particular type of sentence [life in prison without the possibility of parole] as it applies to an entire class of offenders [14-year-olds],” is unconstitutional. Id. Accordingly, this Court must determine whether Miller met his burden to establish that 14-year-olds who have been convicted of capital murder may not, consistent with the Eighth Amendment, be sentenced to life in prison without the possibility of parole. See Harris v. Wright, 93 F.3d 581, 583 (9th Cir.1996) (recognizing that the appellant bears a heavy burden to establish that his sentence is cruel and unusual); cf. United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir.2006) (explaining that the appellant bears the burden to establish that his sentence in disproportionate); Cole v. State, 721 So.2d 255, 260 (Ala.Crim.App.1998) (recognizing that the appellant has the burden to establish that a State statute is unconstitutional); Holmes v. Concord Fire Dist., 625 So.2d 811, 812 (Ala.Civ.App.1993) (“The party mounting a constitutional challenge to a statute bears the burden of overcoming a presumption of constitutionality.”).
A.
As the Court explained in Graham, — U.S. at—, 130 S.Ct. at 2023: “The analysis begins with objective indicia of national consensus.” “ ‘[T]he “clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country’s legislatures.” ’ ” Id. (quoting Atkins v. Virginia, 536 U.S. 304, 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), quoting in turn Penry v. Lynaugh, 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)). In addition to legislation, courts must also consider “[a]ctual sentencing practices.” Id. Based on the record, this Court cannot say that Miller has met his heavy burden of establishing a national consensus against sentencing 14-year-olds who have been convicted of capital murder to life in prison without the possibility of parole.
Regarding juvenile offenders in general, 44 states, the District of Columbia, and the federal government permit a sentence of life in prison without the possibility of parole for homicide offenses. See Graham, — U.S. at-, 130 S.Ct. at 2030. According to the statistics submitted by Miller, 36 states permit a sentence of life in prison without the possibility of parole for offenders who were 14 years of age or younger at the time of the offense.[3] (C.R. 139.) According to an affidavit submitted by Rebecca Kiley, an attorney with the Equal Justice Initiative (the organization representing Miller on appeal), Ms. Kiley conducted research regarding the number of 14-year-olds sentenced to life in prison without the possibility of parole, and she could “identiffy] no more than five dozen ... in nineteen states_” (C.R. 170.) Ms. Kiley also states that between 1995 and 2004, 1,343 individuals were arrested for murder or non-negligent manslaughter.
The evidence contained in the record fails to establish how many 14-year-olds in this State or nationwide have been convicted of homicide offenses. More importantly, the record fails to establish how many individuals 14 years of age or younger have been convicted of capital murder or *688 aggravated murder. Further, nothing in the record indicates how many 14-year-olds have been sentenced to life in prison without the possibility of parole as a result of a conviction for a homicide, aggravated murder, or capital murder. Although the Kiley affidavit indicates that few 14-year-olds have been sentenced to life in prison without the possibility of parole, with no information relating to the number of 14-year-olds actually convicted of homicide offenses, the number is of little value. For instance, the small number of 14-year-olds serving a sentence of life in prison without the possibility of parole could be attributable to the few numbers of 14-year-olds actually convicted of homicide offenses.[4]
With 44 states, the District of Columbia, and the federal government permitting a sentence of life in prison without the possibility of parole for juveniles convicted of homicide offenses, see Graham, — U.S. at—, 130 S.Ct. at 2034-35, 36 states permitting a sentence of life in prison without the possibility of parole for offenders 14 years of age or younger at the time of the offense (C.R. 139), and no evidence in the record relating to “[a]ctual sentencing practices,” Graham, — U.S. at -, 130 S.Ct. at 2023, for 14-year-olds convicted of capital murder, this Court cannot say that Miller has met his burden of establishing a national consensus against sentencing 14-year-olds who have been convicted of capital murder to life in prison without the possibility of parole.
B.
Although Miller failed to establish that a national consensus exists, his failure does not end this Court’s analysis. As the Supreme Court explained in Graham:
“Community consensus, while ‘entitled to great weight,’ is not itself determinative of whether a punishment is cruel and unusual. Kennedy [v. Louisiana], 554 U.S. [407, 434], 128 S.Ct. [2641,] 2658 [ (2008) ]. In accordance with the constitutional design, ‘the task of interpreting the Eighth Amendment remains our responsibility.’ Roper, 543 U.S., at 575, 125 S.Ct. 1183. The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. Id., at 568, 125 S.Ct., 1183; Kennedy, supra, at 436-39, 128 S.Ct., at 2659-60; cf. Solem [v. Helm], 463 U.S., [277] at 292, 103 S.Ct. 8001 [(1983)]. In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. Kennedy, supra, at 439-48, 128 S.Ct., at 2661-65; Roper, supra, at 572, 125 S.Ct. 1183; Atkins, supra, at 318-320, 122 S.Ct. 2242.”
Graham, — U.S. at -, 130 S.Ct. at 2026.
In exercising independent judgment, this Court must first consider the inherent characteristics of the offender that render that individual less culpable and thus might place him in a category or class of individuals for which a particular punishment is prohibited.[5] See Roper v. *689 Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that individuals who commit murder before the age of 18 are less culpable than individuals over the age of 18 and thus may not constitutionally be sentenced to death); Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that individuals who are mentally retarded are less culpable and thus may not constitutionally be sentenced to death). In the present case, Miller was a juvenile when he committed capital murder; therefore, he must be considered less culpable than adult offenders. See Graham, — U.S. at—, 130 S.Ct. at 2026 (citing Roper, 543 U.S. at 569, 125 S.Ct. 1183) (“[Bjecause juveniles have lessened culpability[,j they are less deserving of the most severe punishments.”). Although his age makes him categorically less culpable than an adult offender, Miller did not establish any other natural infirmity that places him in a less culpable category. For instance, although Miller was diagnosed with multiple disorders, such as conduct disorder, attention-deficit disorder, and personality disorder, he was not diagnosed with a severe mental disease or defect. Further, Miller has an IQ in the average range. (R. 1186-87.) See Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that individuals who commit murder before the age of 18 are less culpable than individuals over the age of 18 and thus may not constitutionally be sentenced to death). Accordingly, this Court holds that Miller’s age alone places him in a less culpable class of offenders.
Next, this Court must consider the crime and circumstances of the crime for which Miller has been convicted. See Graham, — U.S. at-, 130 S.Ct. at 2027. The Supreme Court of the United States has repeatedly held that non-homicides and unintentional homicides fall within a category of offenses that are less culpable and thus undeserving of the ultimate penalty. See Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding that the State may not impose a sentence of death on a defendant convicted of an unintentional homicide); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (holding that the State may not impose a sentence of death for rape). Miller was convicted of capital murder, a crime that is not included in any category of offenses that are less culpable and thus undeserving of the ultimate penalty. See Graham, — U.S. at-, 130 S.Ct. at 2027 (recognizing the distinction between intentional homicide offenses and non-homicide offenses).
Moreover, the circumstances of Miller’s crime do not indicate that his crime falls within a category of less culpable offenses. Here, Miller and his accomplice beat Cannon with a bat until he was unable to get up. After rendering Cannon unable to get up, Miller placed a sheet over Cannon’s head and stated, “Cole, I am God, I’ve come to take your life.” Miller then set Cannon’s trailer on fire. Cannon, still alive, asked, “Why are y’all doing this to me?” Cannon eventually died from smoke inhalation. This intentional and horrendous crime could have, but for Miller’s age, made him eligible for a sentence of death in Alabama, see § 13A-5-40(a)(9), Ala.Code 1975; § 13A-5-49(8), Ala.Code 1975, and certainly does not lessen his culpability. Cf. Kennedy v. Louisiana, 554 U.S. 407, 420-21, 128 S.Ct. 2641, 2650, 171 L.Ed.2d 525 (2008) (holding that individuals who have not taken a human life are less culpable than capital murderers and *690 thus may not constitutionally be sentenced to death).
This Court must next consider the severity of the sentence in light of the individual’s culpability and the nature of the crime. See Graham, — U.S. at-, 130 S.Ct. at 2027 (holding that “a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability” and thus cannot be sentenced to life in prison without the possibility of parole). Here, Miller was sentenced to the second harshest punishment — life in prison without the possibility of parole — for committing a crime that falls within the category of the worst offenses, capital murder. Although “[l]ife without parole is an especially harsh punishment for a juvenile,” Graham, — U.S. at-, 130 S.Ct. at 2027, such a sentence is not overly harsh when compared to the crime of which Miller was convicted. This conclusion is buttressed by the Supreme Court’s decision in Graham. There, the Court considered whether a sentence of life in prison without the possibility of parole for a juvenile who committed a non-homicide offense was categorically unconstitutional. Id. In analyzing the constitutionality of Graham’s sentence, the Court determined that “when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability” and thus cannot be subjected to the “the second most severe penalty permitted by law.” Graham, — U.S. at -, 130 S.Ct. at 2028 (emphasis added and citations and quotations omitted). Unlike Graham, Miller committed capital murder and thus does not have “twice diminished moral culpability.” Id. Likewise, although Miller committed one of Alabama’s worst offenses, he was sentenced to the second harshest penalty. Cf. Graham, — U.S. at -, 130 S.Ct. at 2032 (specifically restricting its holding to non-homicide crimes). Considering Miller’s age and his crime, this Court holds that Miller’s sentence of life in prison without the possibility of parole for capital murder is not categorically disproportionate.
Finally, this Court must consider the legitimate penological goals that Miller’s sentence serves. The Supreme Court has recognized the following legitimate penological goals: retribution, deterrence, incapacitation, and rehabilitation. See Graham, — U.S. at-, 130 S.Ct. at 2028-29. This Court holds that deterrence, retribution, and incapacitation are all legitimate penological goals for juveniles who have committed capital murder and therefore justify a sentence of life in prison without the possibility of parole. As stated above, but for Miller’s age, he could have been sentenced to death for his crime. In overturning the death penalty for juveniles, the Supreme Court recognized that “the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person” and thus will serve as an adequate deterrent to potential juvenile, capital offenders. Roper, 543 U.S. at 572, 125 S.Ct. 1183. Further, the State has a legitimate penological goal to seek retribution for juveniles who commit capital murder. As the Supreme Court has explained, “ ‘[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.’ ” Graham, — U.S. at -, 130 S.Ct. at 2028 (quoting Tison v. Arizona, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987)). Here, Miller was sentenced to the second harshest punishment for committing one of the worst crimes. He does not have, as the Supreme Court described, “a twice diminished moral culpability”; therefore, the State’s retribution interest is properly served by the *691 imposition of the second harshest sentence. Graham, — U.S. at -, 130 S.Ct. at 2028. Finally, this Court cannot hold that the State lacks a legitimate goal to incapacitate a juvenile when that individual is willing to take, and has taken, a human life.
In sum, Miller committed the worst crime recognized in Alabama, capital murder, and, solely because of his age, was not eligible for the harshest penalty. Based on the foregoing, this Court holds that Miller’s sentence of life in prison without the possibility of parole — the second harshest sentence — for capital murder does not violate the Eighth Amendment. Therefore, this issue does not entitle Miller to any relief.
II.
Miller next argues that his mandatory sentence of life in prison without the possibility of parole violated his constitutional right to individualized sentencing. Specifically, Miller argues that the Eighth Amendment requires individualized consideration of any mitigation a defendant wishes to offer. Miller then argues that the mandatory minimum sentence for capital murder is unconstitutional because it does not allow for the consideration on mitigation. This argument is without merit.
In Harrmlin v. Michigan, the Supreme Court rejected the argument that mandatory minimum sentences — not involving the death penalty — violated the Eighth Amendment. 501 U.S. 957, 995-96, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). In rejecting the same argument Miller now makes, the Court held that the Constitution does not require individualized sentencing or consideration of mitigation except in cases involving a sentence of death. Id. See also Rodriguez v. Peters, 63 F.3d 546, 567-68 (7th Cir.1995) (holding that the Eighth Amendment does not require the sentencer to consider mitigation before sentencing a juvenile to life in prison for murder because the Eighth Amendment individualized-senteneing requirement applies only in eases involving the death penalty). Here, Miller was not eligible for and did not receive a sentence of death. Therefore, the individualized-senteneing requirement of the Eighth Amendment is inapplicable, Harmelin, 501 U.S. at 995-96, and this issue does not entitle Miller to any relief.
III.
Miller next argues that the circuit court’s verdict form contained erroneous instructions that likely confused the jury and coerced his capital-murder conviction. He also argues that the circuit court’s supplemental jury instruction after the jury returned inconsistent verdicts improperly coerced a capital-murder conviction. These arguments do not entitle Miller to any relief.
To the extent Miller argues that the verdict form contained erroneous instructions, this argument is not preserved for review. At trial, Miller failed to object to the verdict form and did not argue that the instructions on the form were erroneous. Because Miller ‘“did not object to the verdict form at trial ..., this issue was ... not preserved for appellate review.’ ” Doan v. State, 834 So.2d 823, 826 (Ala.Crim.App.2001) (quoting Howell v. State, 659 So.2d 132, 134 (Ala.Crim.App.1994), citing in turn Cotton v. State, 639 So.2d 577, 581 (Ala.Crim.App.1993)). Therefore this issue does not entitle Miller to any relief.
Miller next argues that the circuit court’s supplemental jury instruction after the jury returned inconsistent verdicts improperly coerced a capital-murder convic *692 tion. This issue is likewise not properly before this Court.
At the conclusion of the trial, the jury returned the verdict form. The form indicated that the jury found Miller guilty of the capital offense of murder committed during an arson as charged in count II. The form also indicated that the jury found Miller guilty of the lesser-included offense of felony murder relating to count I. The circuit court then instructed the jury that it could not find Miller guilty of both capital murder and felony murder. According to Miller, during its instruction, the circuit court coerced the jury into finding him guilty of capital murder as charged in count II.
After the circuit court gave the jury the supplemental instruction, Miller moved the circuit court for a mistrial on the ground that the verdicts were inconsistent. He also objected to the circuit court’s instruction on the ground that the instruction “went beyond an admonition ... to go back and deliberate further but went beyond the permissible charge or permissible bounds.”[6] (R. 1390.) Miller did not object on the ground that the instruction was impermissibly coercive; instead, he objected to allowing the jury to deliberate further. It is well settled that “ ‘to preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.’ ” Smith v. State, [Ms. CR-08-0369, Feb. 5, 2010] — So.3d—,—(Ala.Crim.App.2010) (quoting Merchant v. State, 724 So.2d 65 (Ala.Crim.App.1998)). ““‘The statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial.” ’ ” Smith, — So.3d at—(quoting May v. State, 710 So.2d 1362 (Ala.Crim.App.1997), quoting in turn Jackson v. State, 593 So.2d 167 (Ala.Crim.App.1991)). Because Miller did not include improper coercion in his motion for a mistrial or in his objection, this argument is not preserved for this Court’s review. C.f Doan, 834 So.2d at 826. Therefore, this issue does not entitle Miller to any relief.
IV.
Miller next argues that his statements to law-enforcement officers should have been suppressed. Specifically, Miller raises the following arguments relating to his statements: 1) the circuit court erred by failing to conduct a pretrial hearing on his motion to suppress; 2) his statement to Investigator Sandlin should have been suppressed because the State failed to meet its burden of establishing voluntariness and the Miranda[7] predicate; 3) his statements to Deputy Tim McWhorter were taken in violation of his Sixth Amendment right to counsel; and 4) one of his statements should have been suppressed because the State failed to disclose the statement before trial. As discussed below, each of these arguments is unpreserved or without merit.
A.
Miller first argues that the circuit court erred by failing to hold a hearing on his motion to suppress before trial. Within this argument, Miller asserts that: 1) the failure to hold a hearing before trial violat *693 ed Rule 15.4, Ala. R.Crim. P.; 2) failing to hold a hearing before trial allowed the State to use Miller’s statements during its opening statement without there first being an admissibility determination; 3) Miller was given no notice of the suppression hearing as requested by counsel and the lack of notice resulted in Miller not presenting the testimony of Dr. John Goff; 4) the circuit court improperly refused to consider Dr. Goffs testimony; and 5) the circuit court improperly considered a report prepared by Dr. Jerry Gragg because that report was not admitted into evidence, was hearsay, and violated Miller’s right to confront Dr. Gragg.
None of these arguments are preserved for this Court’s review. Before trial, Miller filed a motion to suppress the three statements he gave to law-enforcement officers on the grounds that they were obtained illegally and in violation of Miller’s constitutional rights. Miller also requested that his suppression motion be heard before trial. (Supp. R. 33.)
After the jury had been struck, but before it was impaneled, defense counsel reminded the circuit court that Miller had an outstanding motion to suppress his statements to law-enforcement officers. The State suggested, and the circuit court agreed, that the motion would be taken up during the trial but before the admission of the statements. Defense counsel agreed to this procedure and requested “advance notice ... because [they] might want to put on a couple of witnesses.” Defense counsel then expressed some concern that the State intended to use the statements in its opening statement and that the use of the statement in the opening statement “might be a problem if it’s later suppressed.” (R. 515.) The circuit court explained that they would discuss the matter further after the jury was impaneled. The circuit court impaneled the jury, gave the jurors some preliminary instructions, and allowed the jurors to go home for the day.
After the jurors left, the circuit court took up the State’s use of Miller’s statements in its opening statement. At that point, defense counsel expressed concern that by allowing the State to use Miller’s statements during opening statement, he might be waiving his right to challenge the admissibility of the statements later. Defense counsel then sought and received a continuing objection to the admission of the statements in order to avoid any argument that he had waived his right to object to the admission of the statements. (R. 529.) Defense counsel agreed that because they had a continuing objection to the admission of the statements, they would not interrupt the State’s opening statement to object when the statements were referenced. (R. 531.)
During Investigator Sandlin’s testimony and before the admission of Miller’s statement, the circuit court held a hearing on Miller’s motion to suppress, during which Investigator Sandlin and Miller testified. After the hearing, the circuit court determined that Miller’s statement had been voluntarily given. (R. 693.) Defense counsel requested that the circuit court conditionally admit the statement or, more specifically, that it allow Miller to renew his motion to suppress after Dr. Goff, who was not at the hearing, testified. The circuit court expressed some concern over defense counsels’ proposed procedure. Specifically, the circuit court stated that it believed that the majority of Dr. Goffs testimony would go to the weight of the statement, not its admissibility. The circuit court then instructed counsel that, “I’ll give a proper instruction as to [the weight of the statement;] you can present other matters surrounding the taking of the statement that will deal with [its] admissi *694 bility or not where that’s appropriate.” (R. 691-92.)
In his defense, Miller presented the testimony of Dr. Goff, who testified, among other things, that in his opinion Miller did not understand his Miranda right. After Miller rested, defense counsel renewed the “motion to exclude the statements given by Evan Miller in light of Dr. Goffs testimony that he could not have formed the ability, did not understand the rights he reportedly waived intelligently and knowingly.” (R. 1216.) The circuit court denied Miller’s motion. Specifically, the circuit court stated that the motion was “denied for the reasons stated previously] [i.e., based on the totality of the circumstances, the statement was voluntarily given (R. 693), and] the confession [was] appropriately ... admitted.” The circuit court further stated that, “[fit’s for the jury to determine what to do with it, the weight they will attach to it.” (R. 1216.)
To the extent Miller asserts that: 1) the failure to hold a hearing before trial violated Rule 15.4, Ala. R.Crim. P.; 2) the failure to hold a pretrial hearing allowed the State to use Miller’s statements during their opening statement without there being a determination as to the admissibility of those statements; 3) Miller did not receive advance notice of the suppression hearing as requested by counsel and the lack of notice resulted in Miller not presenting the testimony of Dr. John Goff; and 4) the circuit court improperly considered a report prepared by Dr. Jerry Gragg; Miller either failed to raise these arguments or agreed to the circuit court’s procedure. For instance, although Miller moved the circuit court for a pretrial suppression hearing, he agreed to the proposed procedure of holding the hearing during trial, and never argued that such procedure violated Rule 15.4, Ala. R.Crim. P. Further, Miller acquiesced in the State’s use of his statement during opening argument so long as he did not waive his right to challenge the admissibility of the statement later in the trial. Miller did not assert that he lacked notice of the suppression hearing or that he was incapable of producing witnesses because of a lack of notice. Finally, Miller raised no objection to the circuit court’s consideration of Dr. Gragg’s report.
Because Miller agreed to the procedure used by the circuit court and failed to raise at trial the arguments he now raises on appeal, he failed to preserve these issues for appellate review. See Shouldis v. State, 953 So.2d 1275, 1284 (Ala.Crim.App.2006) (holding that to preserve an alleged error, “a timely objection must be made ..., specific grounds for the objection should be stated, and a ruling on the objection must be made by the trial court”); Harris v. State, 563 So.2d 9, 11 (Ala.Crim.App.1989) (defendant must first obtain an adverse ruling in order to preserve an issue for appellate review); Jordan v. State, 574 So.2d 1024, 1025 (Ala.Crim.App.1990) (claim was not preserved for appellate review where defendant did not first present his argument to the trial court). Therefore, these issues do not entitle Miller to any relief.
To the extent Miller argues that the circuit court violated his constitutional rights by refusing to consider Dr. Goffs testimony in ruling on the admissibility of his statement, this argument is both un-preserved and unsupported by the record. At the close of Miller’s case, he renewed his motion to suppress his statement “in light of Dr. Goffs testimony that [Miller] could not have formed the ability [and] did not understand the rights he reportedly waived....” The circuit court denied the motion. At that point, Miller did not object to the circuit court’s alleged refusal to consider Dr. Goffs testimony. See Foster *695 v. State, 705 So.2d 534, 542 (Ala.Crim.App.1997) (holding that to preserve an alleged due-process violation for appellate review, an objection must be raised at the time of the alleged violation). Because Miller did not object to the circuit court’s alleged refusal to consider Dr. Goffs testimony after Dr. Goff testified, this issue is not preserved for this Court’s review.
Moreover, even if Miller’s argument was properly before this Court, it is not supported by the record. As detailed above, the circuit court initially expressed concern that Dr. Goffs testimony would go only to the weight of the statement; however, he informed counsel that “you can present other matters surrounding the taking of the statement that will deal with [its] admissibility or not where that’s appropriate.” At the conclusion of Miller’s case, defense counsel renewed the motion to suppress “in light of Dr. Goffs testimony that [Miller] could not have formed the ability [and] did not understand the rights he reportedly waived intelligently and knowingly.” The circuit court denied Miller’s motion. Specifically, the circuit court stated that the motion is “denied for the reasons stated previously], the confession [was] appropriately ... admitted.” (R. 1216.)
The record regarding what the circuit court considered is ambiguous at best and fails to establish that the circuit court refused to consider Dr. Goffs testimony.[8] See Klein v. Harris, 268 Ala. 540, 544, 108 So.2d 425, 428 (Ala.1958) (holding that appellate courts “construe the record, when ambiguous, to support the judgment”). Because the record does not establish that the circuit court refused to consider Dr. Goffs testimony as it related to the admissibility of Miller’s statement, this issue does not entitle Miller to any relief.
B.
Miller next argues that his statement to Investigator Sandlin should have been suppressed because the State presented insufficient evidence to show voluntariness and the Miranda predicate.[9] This argument is without merit.
“It has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.” Waldrop v. State, 859 So.2d 1138, 1155 (Ala.Crim.App.2000) (citing Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990)). “The trial court’s finding that a statement was voluntary need only be supported by a preponderance of the evidence.” Ex parte Jackson, 836 So.2d 979, 982 (Ala.2002) (citing Dixon v. State, 588 So.2d 903 (Ala.1991)). “ “Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused — i.e., the totality of the circumstances.’ ” Waldrop, 859 So.2d at 1156 (quoting Click v. State, 695 So.2d 209, 218 (Ala.Crim.App.1996)); see also Ex parte Matthews, 601 So.2d 52, 54 (Ala.1992) (holding that a court must analyze the voluntariness of a confession by examining the totality of the circumstances).
At trial, Investigator Sandlin testified that he had obtained information that Miller had some trading cards that belonged *696 to Cannon. He went to Miller’s trailer, and Miller’s mother invited him inside. At that point, Miller’s mother handed him a box containing Cannon’s trading cards. Investigator Sandlin then asked Miller’s mother and Miller to come to the sheriffs office to give a statement. They agreed and rode with Investigator Sandlin to the sheriffs office.
Once at the sheriffs office, Investigator Sandlin informed Miller of his juvenile Miranda rights. Specifically, Investigator Sandlin read Miller the juvenile Miranda rights form, which stated:
“Before I ask any questions you must understand your rights. You have a right to remain silent. Anything you say can be used against you in a court of law. You have a right to speak with a lawyer for advice before I ask you any question, have them with you during questioning if you wish. If you cannot afford a lawyer, one will be appointed for you without charge before any questioning if you wish. If your lawyer, parents or guardian is not present you have the right to communicate with them and if necessary reasonable means will be provided for you to do so. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering any time until you have spoke[n] to a lawyer.”
(R. 637, C.R. 8.)[10] Miller signed the waiver-of-rights form, and his mother signed it as a witness. According to Investigator Sandlin, Miller appeared to understand his rights, and Miller orally stated that he understood his rights. Investigator Sand-lin also informed the court that Miller was not offered any reward or hope of reward in return for making a statement. Further, Miller signed the waiver-of-rights form acknowledging that he had “read or had [had] read to [him] and [had] had explained to [him], the [juvenile Miranda rights] and [he] fully underst[oo]d what [his] rights are. [He] underst[oo]d and kn[e]w what [he was] doing. No promises or threats [were] made to [him] and no pressure or coercion of any kind [was] used against [him].” (C.R. 8.) Finally, Miller’s waiver of his rights and his assertion regarding his understanding of his rights were witnessed by his mother.
According to Investigator Sandlin, after waiving his rights, Miller gave a statement in which he admitted stealing trading cards, stealing money, and assaulting Cannon. Investigator Sandlin then wrote down what Miller had told him. Miller then signed the written statement.
During the suppression hearing, Miller testified that he did not understand his juvenile Miranda rights. Specifically, Miller stated that he did not understand what the right to remain silent meant. He also testified that he did not understand what the right to an attorney meant. Miller admitted that he had completed the seventh grade in regular classes and that he could read and write. On cross-examination, when asked “[w]hat part of having the right to be silent do you not understand,” Miller responded that he “[j]ust didn’t pay attention to it.” (R. 680.) Miller gave a similar response when asked about his right to an attorney.
Later, Dr. John Goff testified that he administered a test to Miller that was designed to determine a person’s ability to understand his Miranda rights. According to Dr. Goff, Miller’s responses on the *697 test indicated that he did not understand his right to remain silent or his right to an attorney. On cross-examination, Dr. Goff testified that the test he administered to determine whether Miller understood his rights did not encompass the language used in the juvenile Miranda rights form.
Based on the conflicting evidence presented, the circuit court determined that Miller’s statement was voluntary and admissible. “[A] trial court’s ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, and is not to be reversed absent a clear abuse of discretion.” Jones v. State, 946 So.2d 903, 919 (Ala.Crim.App.2006) (citations and quotations omitted). “ ‘ “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.” ’ ” Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005) (quoting State v. Jude, 686 So.2d 528, 530 (Ala.Crim.App.1996), quoting in turn Dowdy v. Gilbert Eng’g Co., 372 So.2d 11, 12 (Ala.1979), quoting in turn Premium Service Corp. v. Sperry & Hutchinson, Co., 511 F.2d 225 (9th Cir.1975)). Here, the circuit court’s determination was supported by the testimony of Investigator Sandlin that Miller was read his rights, that he appeared to understand his rights, and that he stated he understood his rights. Therefore, this Court cannot conclude that the circuit court’s determination constituted an abuse of discretion. See D.M.M. v. State, 647 So.2d 57, 60 (Ala.Crim.App.1994) (holding that “based on the conflicting evidence of voluntariness presented in the record, we find that the juvenile court judge did not abuse her discretion in determining that the appellant’s statements were voluntary and admissible”). Therefore, this issue does not entitle Miller to any relief.
C.
Miller next argues that the circuit court erroneously allowed the State to admit into evidence two statements he made to Deputy McWhorter because those statements were obtained in violation of his Sixth Amendment right to counsel. Specifically, Miller argues that, after his Sixth Amendment right to counsel had attached, the State induced him to make inculpatory statements by having Deputy McWhorter transport him to two mental-health evaluations. According to Miller, Deputy McWhorter was a school-resource officer at Miller’s school, and Miller “had a particular rapport with McWhorter.” (Miller’s brief, at 44). Miller then asserts that by having Deputy McWhorter transport him, the State intentionally created a situation likely to produce a statement, in violation of his Sixth Amendment right to counsel. This issue, however, is not preserved for this Court’s review.
During the suppression hearing relating to Miller’s statements to Deputy McWhorter, defense counsel argued that the statements were involuntary because of Miller’s alleged inability to understand his Miranda rights (reasserting the arguments regarding the suppression of the statement made to Investigator Sandlin). Counsel also objected to the admission of any statements made to a therapist. Miller, however, did not argue that the statements he made to Deputy McWhorter violated his Sixth Amendment right to counsel.
As this Court has repeatedly held, “ ‘to preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.’ ” Smith v. State, [Ms. CR-08-0369, Feb. 5, 2010] — So.3d—,—(Ala.Crim.App.2010) (quoting Merchant v. State, 724 *698 So.2d 65 (Ala.Crim.App.1998)). ‘““The statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial.” ’ ” Smith, — So.3d at—(quoting May v. State, 710 So.2d 1362 (Ala.Crim.App.1997), quoting in turn Jackson v. State, 593 So.2d 167 (Ala.Crim.App.1991)). Because Miller does not argue that his statements to Deputy McWhorter were taken in violation of his Sixth Amendment right to counsel, this argument is not preserved for this Court’s review and does not entitle Miller to any relief.
D.
Miller next argues that the circuit court erred in denying his motion to suppress an oral statement he made to Investigator Sandlin relating to his possession of the trading cards. (C.R. 10, State’s Exhib. 10.) In this oral statement, Miller informed Investigator Sandlin that he had thrown some of Cannon’s trading cards away. Miller contends that this oral statement should have been suppressed because it was not disclosed to defense counsel, in violation of Rule 16, Ala. R.Crim. P., and in violation of the circuit court’s discovery order.
At trial, Investigator Sandlin described going to Miller’s trailer to get Cannon’s trading cards from Miller’s mother. Investigator Sandlin was then asked whether Miller made any statement relating to the cards. At that point, defense counsel objected, arguing, among other things, that defense counsel had not seen a copy of the oral statement; therefore, the State had violated the court’s discovery order. The prosecutor responded that the State did, in fact, disclose the statement to defense counsel. The State asserted that it created a list of items that had been disclosed to the defense and that the oral statement was on that list. The State further asserted that the list was signed by defense counsel.
After weighing the conflicting statements of counsel, the circuit court denied Miller’s motion. Faced with conflicting statements, this Court cannot say that the circuit court abused its discretion in overruling Miller’s motion. Cf. D.M.M. v. State, 647 So.2d at 60 (Ala.Crim.App.1994) (holding that “based on the conflicting evidence of voluntariness presented in the record, we find that the juvenile court judge did not abuse her discretion in determining that the appellant’s statements were voluntary and admissible”). Therefore, this issue does not entitle Miller to any relief.
Moreover, even if the admission of Miller’s oral statement was an error, that error would be harmless beyond a reasonable doubt. Rule 45, Ala. R.App. P. This Court has repeatedly held that “ ‘[t]he erroneous admission of evidence that is merely cumulative is harmless error.’ ” Gobble v. State, [Ms. CR-05-0225, Feb. 5, 2010] — So.3d—,—(Ala.Crim.App.2010) (quoting Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995)). In his oral statement, Miller informed Investigator Sandlin that the trading cards “were the cards that [Miller] didn’t throw away.” (C.R. 10.) This statement, at most, helped to link Miller to the stolen cards. However, Miller’s connection to the cards was also established by his formal statement to Investigator Sandlin in which he admitted stealing the cards. Because the oral statement was cumulative, any error in its admission was harmless. Gobble, — So.3d at -. Therefore, this issue does not entitle Miller to any relief.
V.
Miller next argues that he was erroneously prevented from eliciting testimony regarding his mental state. Specifically, *699 Miller asserts that the circuit court erred in preventing him from questioning Colby Smith about his mental state on the night of the murder. He also argues that the circuit court erroneously prevented Dr. John Goff from testifying as to whether Miller was capable of forming intent.
At trial, defense counsel asked Colby Smith if, in Smith’s opinion, Miller was “thinking clearly” the night of the murder. The prosecutor objected on the ground that Smith cannot testify “as to whether or not what [Miller] was thinking.” (R. 1033.) The circuit court sustained the prosecutor’s objection. At that point, defense counsel asked his next question without making any offer of proof regarding what Smith’s answer would have been had the objection not been sustained.
Later, defense counsel asked Dr. Goff the following question: “[D]oes [Miller] have the ability to form intent?” The prosecutor objected to the question, and the circuit court sustained the objection. Defense counsel then, without making any offer of proof, withdrew the question. (R. 1200.)
Rule 103(a), Ala. R. Evid., provides that “[e]rror may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.” The Alabama Supreme Court has explained that “[w]hen the trial court sustains an objection to a question that does not on its face show the expected answer, a party must make an offer of proof and explain the relevancy of the expected answer to preserve error for appellate review.” Ensor v. Wilson, 519 So.2d 1244, 1262 (Ala.1987) (citing Bessemer Executive Aviation, Inc. v. Barnett, 469 So.2d 1283 (Ala.1985)). “[I]n the absence of an offer of proof [regarding a witness’s expected answer], [appellate courts] cannot review [the exclusion of testimony]. To attempt to do so would necessitate impermissible speculation by this Court.” Burkett v. American Gen. Fin., Inc., 607 So.2d 138, 140 (Ala.1992) (citing Ensor, 519 So.2d at 1262, and C. Gamble, McElroy’s Alabama Evidence § 425.01(4) (4th ed. 1991)).
Here, defense counsel failed to proffer what answers Smith and Dr. Goff would have given if the prosecutor’s objection had not been sustained. In fact, he withdrew the question to Dr. Goff. Because defense counsel did not proffer what the witnesses’ testimony would have been, this Court cannot determine that the exclusion of the testimony affected a “substantial right” or was prejudicial. Rule 103(a), Ala. R. Evid. Accordingly, Miller failed to preserve this issue for appellate review. See Perry v. State, 568 So.2d 873, 874-75 (Ala.Crim.App.1990) (“[B]ecause [the appellant failed] to make an offer of proof as to the expected testimony of the witness, this issue is not preserved for review.”). Therefore, this issue does not entitle Miller to any relief.
VI.
Miller next argues that the circuit court erroneously allowed “an unqualified witness to offer important testimony concerning physical evidence in the case.” (Miller’s brief, at p. 55.) He argues that the circuit court erred in permitting Nancie Jones, the head of the DNA section of the Huntsville Regional Laboratory of the Alabama Department of Forensic Sciences, to testify that the blood spatter on the front of Miller’s shirt was consistent with Cannon having been struck with an object such as a bat. According to Miller, the State failed to establish that Jones is a expert in blood-spatter analysis; therefore, this testimony should have been excluded.
*700 Assuming, without deciding, that the State failed to present sufficient evidence to establish that Jones is an expert in blood-spatter analysis, any error in allowing her testimony regarding what could have caused the blood spatter on Miller’s shirt was harmless beyond a reasonable doubt. See Rule 45, Ala. R.App. P. It is well settled that “ ‘[tjestimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.’ ” Gobble v. State, [Ms. CR-05-0225, Feb. 5, 2010] — So.3d—,—(Ala.Crim.App.2010) (quoting Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1998)). That is, “ ‘[t]he erroneous admission of evidence that is merely cumulative is harmless error.’ ” Gobble, — So.3d at-(quoting Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995)).
At trial, the State presented testimony that after Miller attempted to steal Cannon’s wallet, Miller and Cannon struggled with one another. During the struggle, Miller hit Cannon multiple times with his fist, and Smith hit Cannon on the head with a bat. During this time, Miller also hit Cannon with the bat. The State also presented evidence indicating that the shirt Miller was wearing on the night of Cannon’s murder had blood spatter on it. DNA testing of the spatter indicated that the blood was consistent with Cannon’s. Finally, law-enforcement officers recovered an aluminum bat from the scene that had bloodstains on it.
From the evidence establishing that Cannon was hit on the head with a bat while he was struggling with Miller, it is reasonable to infer that the blood spatter on Miller’s shirt was the result of Cannon being hit with an object, i.e., the bat or Miller’s fists. Therefore, Jones’s testimony that the blood spatter on the shirt was caused by Cannon being hit with an object was cumulative. See Gobble, — So.3d at -(quoting Yeomans, 641 So.2d at 1272) (holding that “‘[tjestimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred’ ”). Consequently, any error in the admission of Jones’s testimony was harmless and does not entitle Miller to any relief. Rule 45, Ala. R.App. P.
VII.
Miller next argues that the circuit court erred in failing to give two jury instructions. Specifically, Miller asserts that the circuit court erroneously failed to instruct the jury on lesser-included offenses. He also contends that the circuit court erroneously refused to instruct the jury regarding a witness’s possible motives for testifying.
A.
Miller first argues that the circuit court erred in refusing to give his requested jury instructions on the lesser-included offenses of “intentional murder, extreme indifference murder, and manslaughter with provocation.” (Miller’s brief, at p. 58-59). Although Miller submitted his requested jury instructions in writing before trial, he did not object when the circuit court failed to give the requested instructions.
“No party may assign as error the court’s ... failing to give [an] instruction ... unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.”
Rule 21.3, Ala. R.Crim. P. Because Miller did not object when the circuit court failed to instruct the jury on lesser-included offenses, he did not preserve this argument *701 for appellate review. See Rule 21.3, Ala. R.Crim. P.; Bullock v. State, 697 So.2d 66 (Ala.Crim.App.1997); see also Goins v. State, 521 So.2d 97, 98 (Ala.Crim.App.1987). Therefore, this issue does not entitle him to any relief.
B.
Miller next argues that the circuit court erroneously refused to instruct the jury that it could consider a witness’s motivation for gain in evaluating the credibility of that witness’s testimony. At the conclusion of the circuit court’s jury instructions, Miller asked the circuit court to “charge the jury on the consideration they can give to anyone’s motive for gain to testify.” (R. 1382-83.) The circuit court ruled that the requested instruction was covered by the instruction he gave on witnesses’ possible biases.
“A trial court has broad discretion when formulating its jury instructions .... ” Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999) (citing Williams v. State, 710 So.2d 1276, 1305 (Ala.Crim.App.1996)). “When reviewing a trial court’s jury instructions, [this Court] must view [the instructions] as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
“Although ... [a] defendant is entitled to have the trial court instruct the jury on his theory of defense, it is ... well established that [t]he trial judge may refuse to give a requested jury charge when the charge is either fairly and substantially covered by the trial judge’s oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law.”
Reeves v. State, 807 So.2d 18, 41 (Ala.Crim.App.2000) (citations and quotations omitted). See also Riley v. State, 875 So.2d 352, 358 (Ala.Crim.App.2003) (holding that “the trial judge properly refused the charge because the charge was substantially covered by the trial judge’s oral charge”).
Here, the circuit court instructed the jury that, in weighing the credibility of witnesses, it could consider any witness’s possible bias. “[A] reasonable juror would have interpreted,” Johnson, 820 So.2d at 874, the circuit court’s instruction to cover motivation for testifying. See Black’s Law Dictionary, 171 (8th ed. 2004) (defining bias as, among other things, an “inclination”). Because Miller’s requested instruction was substantially covered by the circuit court’s instruction, the circuit court did not abuse its discretion by refusing it. Therefore, this issue does not entitle Miller to any relief.
VIII.
Miller next argues that, during closing argument, the prosecutor misled the jury regarding the law of intent as it related to count I of the indictment, the capital offense of murder during a robbery. He further argues that, during his rebuttal closing argument, the prosecutor improperly equated Miller’s lack-of-intent argument with an insanity defense, thereby shifting the burden to Miller to disprove intent. The arguments are without merit.
. A.
To the extent Miller argues that the prosecutor misled the jury on the element of intent regarding count I charging Miller with murder made capital because it was committed during the course of a robbery, this argument is moot. The portion of the prosecutor’s argument that Miller argues misstates the law of intent was as follows:
*702 “The charge which I read to you back when we started this case, first charge being capital murder during the course of a robbery. That’s what the State is required to prove to you for [you] to find the verdict of guilty as to that charge. One is that the defendant caused the death of Cole Cannon. And the second element would be that it was during the course of a theft of property and that force was used during that theft, that makes it a robbery. You have a murder during the course of a robbery while the defendant was armed with a deadly weapon, in this case a baseball bat. The force used can also be the hitting of the bat and also be used in the escaping with the property, not just in the taking of the property.”
(R. 1269-1270; emphasis added.) According to Miller, because the prosecutor failed to mention intent as an element, his conviction must be reversed. However, the jury acquitted Miller of capital murder/robbery. Miller’s “acquittal on the [count I] renders this issue moot. ‘Only the count upon which appellant was found guilty is subject to appellate review.’” Snell v. State, 677 So.2d 786, 791 (Ala.Cr.App.1995) (quoting DeFries v. State, 597 So.2d 742, 744 (Ala.Crim.App.1992), quoting in turn Hammond v. State, 354 So.2d 280, 284 (Ala.Crim.App.1977)). See also Inmon v. State, 585 So.2d 261, 264 (Ala.Crim.App.1991) (holding that an appellant’s challenge to the sufficiency of the indictment relating to a charge in the indictment was moot because the jury had acquitted him of that charge). Because Miller’s challenge to the prosecutor’s argument relating to count I was made moot by his acquittal on that count, this issue is not properly before this Court. Accordingly, this issue does not entitle Miller to any relief.
To the extent Miller argues that the prosecutor misled the jury on the element of intent regarding count II charging Miller with murder made capital because it was committed during the course of an arson, this argument is not preserved for appellate review and is without merit. It is well settled that “[w]hen no objection is made following a prosecutor’s allegedly improper remark, a claim of error based on improper argument of counsel is not preserved for appellate review.” May v. State, 710 So.2d 1362, 1373 (Ala.Crim.App.1997) (citing Lee v. State, 562 So.2d 657 (Ala.Crim.App.1989)). See also Buford v. State, 891 So.2d 423, 434 (Ala.Crim.App.2004) (holding that the appellant failed to preserve his challenge to the prosecutor’s comment because he failed to object at trial). After the prosecutor gave his “synopsis” of the elements of murder made capital because it was committed during the course of an arson, Miller’s counsel did not raise any objections. (R. 1271.) Because Miller failed to preserve this issue, it “is not properly before this Court for appellate review.” Dickey v. State, 901 So.2d 750, 755 (Ala.Crim.App.2004).
Even if this issue was preserved for appellate review, it would not entitle Miller to any relief. “In judging a prosecutor’s closing argument, the standard is whether the argument ‘ “ ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ” ’ ” Sneed v. State, 1 So.3d 104, 138 (Ala.Crim.App.2007) (quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting in turn Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Before the prosecutor’s “synopsis” of what the State had to prove to establish murder during the course of an arson, the circuit court informed the jury that the court would “give [it] all of the *703 elements of the offenses, capital offenses, ... at the conclusion of argument by both sides.” (R. 1270-71.) Later, after closing arguments, the circuit court correctly instructed the jury on each of the elements of murder during the course of an arson. (R. 1344-47.) The circuit court then instructed the jury that if it found that the State “failed to prove beyond a reasonable doubt any one or more of the elements of this offense of intentional murder during [an] arson ..., then you cannot find the defendant guilty of this capital offense.” (R. 1347.) See Frazier v. State, 758 So.2d 577, 604 (Ala.Crim.App.1999) (“The jury is presumed to follow the instructions given by the trial court.”) (quoting Hutcherson v. State, 727 So.2d 846, 854 (Ala.Crim.App.1997), citing in turn Taylor v. State, 666 So.2d 36, 70 (Ala.Crim.App.1994)).
Because the jury was aware that the prosecutor merely gave a synopsis of what the State was required to prove, because the circuit court informed the jury that it would instruct the jury on all of the elements of the capital offenses, and because the circuit court did in fact properly instruct the jury on all of the elements of the capital offenses, this Court cannot say that the prosecutor’s statement “ ‘ “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ ” Sneed, 1 So.3d at 138 (quoting Darden, 477 U.S. at 181, quoting in turn Donnelly, 416 U.S. at 643). Therefore, this issue does not entitle Miller to any relief.
B.
Miller’s argument that the prosecutor improperly equated Miller’s lack-of-intent argument with an insanity defense, thereby shifting the burden to Miller to disprove intent, is not preserved for appellate review. At trial, Miller failed to object to the comment that he now asserts improperly equated intent with an insanity defense. It is well settled that “[w]hen no objection is made following a prosecutor’s allegedly improper remark, a claim of error based on improper argument of counsel is not preserved for appellate review.” May v. State, 710 So.2d 1362, 1373 (Ala.Crim.App.1997) (citing Lee v. State, 562 So.2d 657 (Ala.Crim.App.1989)). See also Buford v. State, 891 So.2d 423, 434 (Ala.Crim.App.2004) (holding that the appellant failed to preserve his challenge to the prosecutors comment because he failed to object at trial). Because Miller failed to preserve this issue, it “is not properly before this Court for appellate review.” Dickey v. State, 901 So.2d 750, 755 (Ala.Crim.App.2004). Therefore, Miller is not entitled to any relief.
IX.
Miller next argues that the circuit court erred in repeatedly informing the jury about his possible punishments. Specifically, he contends that the circuit court’s instructions were “highly prejudicial” and “inject[ed] [irrelevant] considerations of punishment into the jury’s guilt-innocence decision.” (Miller’s brief, at p. 66, 68.) Miller, however, did not first present this argument to the circuit court. Therefore, he did not preserve this issue for appellate review. See Harris v. State, 563 So.2d 9, 11 (Ala.CrimApp.1989) (defendant must first obtain an adverse ruling in order to preserve an issue for appellate review); Jordan v. State, 574 So.2d 1024, 1025 (Ala.Crim.App.1990) (claim was not preserved for appellate review where defendant did not first present his argument to the trial court). Consequently, this issue does not entitle Miller to any relief.
X.
Miller next argues that the circuit court erroneously denied his motion for discov *704 ery of transcripts of the grand-jury proceedings. In his motion, and during the hearing on the motion, Miller offered nothing more than bare assertions that a transcript of the grand-jury, proceedings might contain impeachment testimony.
“Alabama has long protected the secrecy of grand-jury proceedings.” Blackmon v. State, 7 So.3d 397, 409 (Ala.Crim.App.2005) (citing § 12-16-214, Ala. Code 1975). “However, a defendant may be allowed to inspect grand-jury proceedings if the defendant meets the threshold test of showing a ‘particularized need’ for breaching the secrecy of those proceedings.” Blackmon, 7 So.3d at 409. The Alabama Supreme Court has explained that:
“Before a defendant is allowed to inspect a transcript of a State’s witness who testified before the grand jury[,] ... the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness’ grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony.”
McKissack v. State, 926 So.2d 367, 370 (Ala.2005) (citations and quotations omitted). Before a defendant may inspect grand-jury testimony, he must “show[ ] [a] likelihood of inconsistencies between the [State’s witness’s] grand-jury ■ testimony ... and their trial testimony.” McKis-sack, 926 So.2d at 372. This burden is not met until the defendant has “established that there was a genuine concern that there could be inconsistencies between the grand-jury testimony and the trial testimony....” Id. at 375 (citations and quotation omitted). Bare assertions that the grand-jury transcripts might disclose impeachment evidence is insufficient to establish a “particularized need” for discovery of these proceedings. Billups v. State, [Ms. CR-05-1767, Nov. 13, 2009] — So.3d -, - (Ala.Crim.App.2009). “Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the defendant’s testimony....” McKissack, 926 So.2d at 370 (Ala.2005) (citations and quotations omitted).
Here, Miller has presented nothing more than a bare assertion that the grand-jury testimony might contain impeachment evidence. He did not attempt to establish what impeachment evidence would be discovered. Accordingly, Miller failed to meet his burden to establish a particularized need for a transcript of the grand-jury proceedings, and the circuit court did not abuse its discretion by denying his discovery motion.
XI.
Miller next argues that the trial court erred in admitting autopsy photographs, crime-scene photographs, and a video of the crime scene. Specifically, Miller contends that these exhibits were cumulative, inflammatory, and unduly prejudicial; therefore, the trial court erred in allowing them to be admitted.
Alabama courts have long recognized that photographs depicting the crime scene and the wounds of the victims are relevant and admissible. See Stallworth v. State, 868 So.2d 1128, 1151 (Ala.Crim.App.2001) (“The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim’s wounds are admissible despite the fact that they may be gruesome or cumulative.” (quoting Land v. State, 678 So.2d 201, 207 (Ala.Crim.App.1995))); Ward v. State, 814 So.2d 899, 906 (Ala.Crim.App.2000) (“ ‘The same rule applies to videotapes [that applies to] photo *705 graphs(quoting Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989))). In Brooks v. State, this Court explained that:
“ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” ’ Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), affd, 494 So.2d 154 (Ala.1986). ‘Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.’ Williams v. State, 506 So.2d 368, 371 (Aa.Crim.App.1986) (citations omitted). In addition, ‘photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.’ Ex parte Siebert, 555 So.2d 780, 784 (Aa.1989). ‘This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim’s injuries.’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[Ajutopsy photographs depicting the character and location of wounds on a victim’s body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.” ’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953 (2002), on remand to, 851 So.2d 453 (Ala.2002).”
973 So.2d 380, 393 (Aa.Crim.App.2007).
This Court has reviewed the crime-scene photographs, the crime-scene video, and the autopsy photographs and holds that they were relevant and admissible to show the scene of the crime and the extent of the victim’s injuries. Further, although unpleasant, the photographs were not unduly gruesome. Therefore, the circuit court did not commit any error in allowing the photographs to be admitted at trial.
XII.
Miller next argues that the circuit court erred in failing to protect him from prejudicial pretrial publicity. Specifically, he contends that the circuit court should have sequestered the jury or taken other necessary steps to prevent the jury from viewing prejudicial images of him wearing shackles and handcuffs on television. (Miller’s brief, at p. 74-75). Miller, however, did not preserve these issues for appellate review.
The record indicates that before trial, Miller’s defense counsel requested that the jury be sequestered in an effort to control pretrial publicity. Initially, the circuit court indicated that it would likely sequester the jury, but stated that the issue would be taken up later. Defense counsel did not raise the issue of sequestering the jury again and did not obtain an adverse ruling on the motion. The circuit court subsequently instructed the jury not to watch any television coverage of the trial. Later in the trial, Miller’s trial counsel requested that the court repeat its instruction regarding television coverage. The circuit court agreed to give the instruction again at the end of the day but advised Miller’s trial counsel that he “may want to remind [him]”. (R. 695). Miller’s *706 trial counsel, however, failed to remind the court of their agreement before the recess, and the requested instruction was never given.
Because Miller did not object to the circuit court’s failure to rule on his motion to sequester the jury and did not object when the jury was not sequestered, he never received an adverse ruling. Likewise, Miller did not obtain an adverse ruling when the circuit court failed to re-instruct the jury to avoid watching any television coverage of the trial. Consequently, these issues were not preserved and are not properly before this Court. See Harris v. State, 563 So.2d 9, 11 (Ala.Crim.App.1989) (defendant must first obtain an adverse ruling in order to preserve an issue for appellate review); Birge v. State, 973 So.2d 1085, 1105 (Ala.Crim.App.2007) (holding that “in order to preserve an issue for appellate review, a timely objection must be made in the trial court, and the court must enter an adverse ruling”). Therefore, Miller is not entitled to any relief.
XIII.
Miller next argues that the circuit court erred in failing to declare a mistrial or to impanel a new jury because some members of Cannon’s family were wearing buttons displaying Cannon’s picture during the first day of voir dire.
After noticing several individuals wearing the buttons, Miller’s trial counsel informed the court of his concerns and asked that the court order that the pins be removed. After hearing from both defense counsel and the State, the court ordered that the buttons be removed while the individuals were in the presence of the venire or jury. The circuit court then stated that it would leave it up to the State to carry out its directives. At the conclusion of their discussion, Miller’s trial counsel indicated that he was satisfied with the court’s decision and at no time did he move for a mistrial or request a new venire. Consequently, Miller’s argument that the circuit court erred in failing to grant him a mistrial or to impanel a new jury venire is not preserved for appellate review. See Harris v. State, 563 So.2d 9, 11 (Ala.Crim.App.1989) (defendant must first obtain an adverse ruling in order to preserve an issue for appellate review); Jordan v. State, 574 So.2d 1024, 1025 (Ala.Crim.App.1990) (claim was not preserved for appellate review where defendant did not first present his argument to the trial court). Therefore, Miller is not entitled to any relief.
XIV.
Miller finally argues that the circuit court erroneously prevented the defense from obtaining information about venire-members’ exposure to media coverage of the crime. Specifically, Miller asserts that the circuit court’s denial of his motions for a jury questionnaire and for individual voir dire prevented him from discovering the extent to which veniremembers had been exposed to media coverage of the crime.
When the circuit court denied Miller’s motion for a jury questionnaire and for individualized voir dire, the circuit court explained that it would bring the venire-members into the courtroom in panels and allow both sides to question the panels. Thereafter, the circuit court brought panels of 18 veniremembers into the courtroom for voir dire examination and provided both sides an opportunity to question the veniremembers.
It is well settled that “ ‘the method of voir dire examination is within the discretion of the trial court and a trial court’s refusal to allow the use of [a] juror questionnaire is not an abuse of that dis *707 cretion.’ ” Hodges v. State, 856 So.2d 875, 918 (Ala.Crim.App.2001) (quoting Ex parte Land, 678 So.2d 224, 242 (Ala.1996)). Likewise, “ ‘there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination.’ ” Sneed v. State, 1 So.3d 104, 135 (Ala.Crim.App.2007) (quoting Coral v. State, 628 So.2d 954, 968 (Ala.Crim.App.1992)). “ ‘This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.’” Sneed, 1 So.3d at 135 (quoting Coral, 628 So.2d at 968).
The record indicates that the circuit court did not abuse its discretion in its method of conducting voir dire examination. The circuit court allowed the venire-members to be questioned in panels of 18, and both sides were allowed ample opportunity to question the veniremembers. Miller has failed to point to any indication in the record that he was denied a fair opportunity to question veniremembers or that he was prevented from discovering information relating to media exposure through questioning. Accordingly, Miller has not established that the circuit court abused its discretion in the manner in which it conducted voir dire.
For the foregoing reasons, the judgment of the circuit court is affirmed.
OPINION OF JUNE 25, 2010, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED; APPLICATION FOR REHEARING IS OVERRULED.
WISE, P.J., and WELCH, KELLUM, and MAIN, JJ., concur.

. Miller’s case was transferred from the Juvenile Court of Lawrence County to the Lawrence Circuit Court for prosecution as an adult. See Ex parte 928 So.2d 1081, 1082 (Ala.2005):

. Miller does not challenge his sentence as grossly disproportionate to the offense, i.e., the first classification for proportionality challenges. Therefore, this Court does not reach that issue.

. This exhibit indicates that in Alabama, the minimum age an individual may be sentenced to life in prison without the possibility of parole is 16. As this case establishes, that information is inaccurate.

. The Kiley affidavit states that, between 1995 and 2004, 1,343 individuals 14 years old or younger have been arrested for homicide crimes. (C.R. 170.) Without knowing how many of those individuals were eventually convicted, these numbers establish very little. Further, because the age range is birth to 14 years old, it is impossible to determine how many of those 1,343 individuals that were arrested were eligible to be tried as adults.

. Because Miller seeks a rule categorically barring the imposition of a particular sentence for a class of individuals, this Court is concerned only with characteristics common to the class as a whole, such as age or mental *689 retardation. See Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. The State argues that this Court should remand the cause with instructions for the circuit court to reinstate the jury’s original verdict. The State, however, did not file a petition for a writ of mandamus directed to the circuit court or file a notice of appeal. Therefore, this argument is not properly before this Court.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Had Miller objected to the circuit court's alleged refusal to consider Dr. Goff's testimony when he renewed his motion to suppress, the record might disclose whether Dr. Goff's testimony was in fact considered.

. This argument is presented in Section IV(C) of Miller’s brief.

. Miller, his mother, and two probation officers were present when Miller was read his rights.