Filed 1/30/15; unmodified opn. attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re DERRICK LYNN WILSON,<br><br>        on Habeas Corpus. | B254093<br><br>(Los Angeles County<br>Super. Ct. No. KA028967)<br><br>**ORDER MODIFYING OPINION**<br>**NO CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on January 22, 2015, and certified for publication, be modified as follows:

1. On page 19, footnote 17 reads as follows:

Earlier this year in *In re Rainey* (2014) 224 Cal.App.4th 280, the First District Court of Appeal held that *Miller* announced new substantive rules and therefore applied retroactively to cases on collateral review. However, the Supreme Court granted a petition for review in *Rainey.* (*In re Rainey* (2014) __ Cal.4th __, 326 P.3d 251 (S217567).) In granting review, the Court ordered briefing deferred pending decision in *In re Alatriste* (S214652) and *In re Bonilla* (S214960) which included the issue: "Does *Miller* apply retroactively on habeas corpus to a prisoner who was a juvenile at the time of the commitment offense and who is presently serving a sentence that is the functional equivalent of life without the possibility of parole?"

It should read:

The issue whether *Miller* applies retroactively on habeas corpus to a prisoner who was a juvenile at the time of the commitment offense is pending before the Supreme Court in *In re Rainey* (2014) 224 Cal.App.4th 280, review granted June 11, 2014, S217567 (briefing deferred pending decision in *In re Alatriste*, review granted Feb. 19, 2014, S214652, and *In re Bonilla*, review granted Feb. 19, 2014, S214960).

The forgoing does not change the judgment.

---

**WOODS, Acting P. J.**　　　　　　　　　　　　　　**ZELON, J.**

Filed 1/22/15; unmodified version

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re DERRICK LYNN WILSON,<br><br>        on Habeas Corpus. | B254093<br><br>(Los Angeles County<br>Super. Ct. No. KA028967) |

        ORIGINAL PROCEEDING on a petition for writ of habeas corpus. Robert Armstrong, Judge.  Petition granted.

        Michael J. Brennan and Heidi L. Rummel, Post-Conviction Justice Project, University of Southern California Law School, for Petitioner.*

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Taylor Nguyen, Deputy Attorneys General, for Respondent.

_____

*Elizabeth Little, Certified Law Student, presented oral argument.

Petitioner Derrick Lynn Wilson seeks habeas relief asserting, among other contentions, that pursuant to the principles announced in *Miller v. Alabama* (2012) 567 U.S. ___, 132 S.Ct. 2455 (*Miller*), the life imprisonment without parole (LWOP) sentence he received in 1996 for a crime he committed when he was 17 years old violates the Eighth Amendment prohibition on cruel and unusual punishment. Wilson further argues he is entitled to be resentenced based on the individual sentencing factors that the *Miller* Court directed trial courts to consider when sentencing a juvenile offender for a homicide conviction. We conclude that Wilson is entitled to habeas relief, and therefore grant the petition for writ of habeas corpus, and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Crimes[1]

On August 22, 1995, three masked males, later identified as Petitioner Wilson, Bobby White and Jamon Carr, approached the Chino Valley Bank in Pomona. Wilson, White and Carr were all 17 years old at the time. They were armed with handguns. As they walked towards the bank, one of the young men fired at the security guard who stood outside the bank near the ATM machine. The security guard was not hit by the shots; he fled on foot and then alerted police.

Once inside the bank, one of the young men told the customers to "hit the deck." The young men then jumped over the teller counter; one of them grabbed Theresa Hernandez, a bank employee. They ordered Hernandez to give them money and pointed to the teller counter. Hernandez responded that the money was not there. At some point during the encounter, Hernandez was struck in the head. She dropped her keys, and as she bent down to retrieve them, one of the three assailants shot and killed her.

Wilson, Carr and White ran out of the bank. They fled in a car driven by Quentin Smith. Another car occupied by Kareem Jamal Brown also waited nearby for the trio.[2]

---

[1] The facts relating to the crimes are taken from this court's opinion in Wilson's direct appeal (case No. B104556).

Shortly after the robbery, White admitted to his girlfriend that he had participated in the crimes and shot Hernandez during the robbery. White said that he shot Hernandez because he thought that Hernandez was activating an alarm. Petitioner Wilson admitted to his fiancée that he had "pistol whipped" the victim.

Brown was arrested.[3] Wilson, Carr and White turned themselves into the police a few days after the robbery.

## B. Wilson's Background[4]

Wilson was born on September 7, 1977. He lived with his parents and two younger siblings in Inglewood, and then later in south central Los Angeles.

According to Wilson and his mother, his family life was very structured; his parents were overprotective and were strict disciplinarians. Wilson's mother chose his friends, rarely allowed him to watch television, and would not let him play outside with other neighborhood children. He was not allowed to spend the night at a friend's home. Until he was in high school, Wilson attended Los Angeles Christian School, where his mother worked.

When Wilson was a pre-teen he began to feel frustrated by his school and strict home life; Wilson felt isolated and resentful because of the restrictions placed on him by his parents. He claimed that he was teased in the neighborhood for attending a charter school and because he wore a school uniform. Wilson began going out at night without

---

[2]    Smith and Brown were adults at the time of the attempted robbery. On the day of the robbery, Brown and Smith drove Wilson and his codefendants to the bank. According to Wilson, Brown told them that because White, Wilson and Carr were minors they would not receive harsh sentences if they were caught. Brown and Smith instructed Wilson and his codefendants to throw the money and guns in Brown's car, and then drive away in Smith's car after the robbery.

[3]    Smith died prior to trial.

[4]    The facts relating to Wilson's background and family history are taken from declarations of Wilson and his mother that were attached as exhibits filed in support of his petition for habeas corpus. This information was not presented during his original sentencing hearing.

his parents' knowledge, and fought with his parents when they attempted to control his actions. Wilson's father would often hit him with a belt or switch.

Wilson began having behavioral problems at his school. His parents decided to send him to a public high school. He initially attended El Camino Real Charter High School in the San Fernando Valley. By his early teens, Wilson began using marijuana and alcohol on a regular basis. Wilson was truant from school. He associated with older males in his neighborhood who had made money by selling drugs and committing crimes. His parents would lock him out of the house for violating the house rules.

In ninth grade Wilson was expelled from El Camino Real Charter High School for fighting. Wilson's mother enrolled him at Washington High School in Los Angeles. She later discovered that Wilson was not attending classes at Washington High School.

Wilson ran away to his paternal aunt's house, after his mother found drug paraphernalia in his clothing. Wilson moved back and forth between his parents' home and various relatives for a number of months. After one of Wilson's friends was involved in a shooting, his mother sent him to Arizona to stay with another maternal aunt. Wilson soon found himself in trouble with his aunt for skipping school so he returned to Los Angeles. Wilson emulated the lifestyle of his friends who sold and abused drugs, consumed alcohol and did not attend school. At age 15, he joined the East Coast Crips gang and became involved in gang activity.

During this period, Wilson continued to move from place to place, staying with extended family, with friends, on the streets, or in motels. When Wilson was 17 years old, he rented an apartment and began dating Keisha Kelly. Wilson soon moved in with Ms. Kelly. He helped her pay the bills and buy groceries and school supplies for her children.

Wilson met two of his codefendants, Carr and White, through one of Ms. Kelly's friends. Wilson and his codefendants began spending time together and were involved in some minor robberies. Brown, who was 22 years old at the time, approached Carr, White, and Wilson, and proposed that they rob a bank in Pomona. According to Wilson,

4

Brown picked them up the night before the robbery, and took them to his house, where they spent the night. Brown also supplied guns to use in the robbery.

## C. Conviction, Sentencing, Appeal and Instant Petition for Habeas Petition

Wilson and his three codefendants were charged with first degree murder (with a robbery special circumstance); attempted robbery with an allegation that White personally used a firearm; and attempted murder. Wilson was tried with his codefendants Brown, Carr, and White. On April 12, 1996, Wilson was found guilty of felony murder in the first degree, in violation of Penal Code section 187, subdivision (a); [5] attempted second degree robbery, and attempted murder.

On April 30, 1996, Wilson and his codefendants appeared for a sentencing hearing. During the proceeding, family members and friends of the victim testified and asked the court to impose an LWOP sentence on the defendants. No evidence or witnesses were presented on behalf of Wilson during that hearing. The court continued the sentencing, indicating that any mitigating evidence on behalf of Wilson and his codefendants could be offered at a later date.

On June 7, 1996, Wilson again appeared for sentencing. On this date, Wilson attempted to substitute out his attorney for another attorney. The court denied the motion. No individuals spoke on Wilson's behalf during that proceeding. The matter was continued to September 6, 1996, to allow Wilson to participate in a psychiatric evaluation.

Wilson did not participate in the evaluation, however. At the continued sentencing hearing, Wilson's counsel provided the court with a mitigation statement, and asked the court to exercise its discretion to sentence Wilson to 25 years to life rather than LWOP. The mitigation statement noted that: (1) Wilson was a minor at the time of the offense and induced by others to participate in the crime; (2) Wilson had no prior criminal record; (3) at the time of his arrest he was still pursuing his high school diploma and was

---

[5] All references to statute are to the Penal Code unless otherwise indicated.

5

employed; and (4) Wilson voluntarily acknowledged his wrongdoing at an early stage of the criminal process.

At sentencing, the court considered evidence submitted by the prosecution that: the crime involved great violence and bodily harm; Wilson was armed; the victim was in a vulnerable position; Wilson was a leader; Wilson was a participant in a planned robbery; and the crime included an attempted taking of great monetary value.

The court imposed on Wilson the sentence of life without the possibility of parole. In explaining the decision, the court stated: "In this matter, we did have a sentencing hearing and there were many people who gave the court the benefit of input, and of course, I tried the case and heard all of the facts. [¶] And in this matter, the jury found the defendant guilty of the attempted robbery and the attempted murder of the guard and the murder of the victim. And even though he was not the shooter, the evidence was clear that he was a very active participant and that he did, in fact, pistol-whip the victim before the co-defendant actually shot her to death. [¶] That the jury found the special circumstances to be true would mandate life without the possibility of parole but for the fact of the defendant's age. And the court does have some discretion in that manner. [¶] So in passing the sentence, I want to make it clear that I have considered that possibility. I've exercised that discretion and I find that in view of the totality of the circumstances in this case that the defendant does not merit such consideration and the verdict of the jury is compelling and, therefore, as to the count of murder, the defendant is sentenced to life imprisonment without the possibility of parole."

On July 20, 1998, this court affirmed the judgment on direct appeal (case No. B104556).

On May 6, 2013, Wilson filed a petition for writ of habeas corpus in the Los Angeles County Superior Court (case No. KA028967), challenging the constitutionality of his LWOP sentence in light of the United States Supreme Court's opinion in *Miller*. Wilson argued that *Miller* requires reexamination of the constitutionality of his sentence, including the validity of the statutory scheme the sentencing court used to select the punishment and the adequacy of the sentencing court's consideration of the distinctive

6

mitigating features of youth addressed in the *Miller* opinion. Wilson also requested that the superior court defer further briefing pending the outcome of two cases – *People v. Moffett* (S206771) and *People v. Gutierrez* (S206365) – that were pending before the California Supreme Court.[6]

In July 2013, the Los Angeles County Superior Court issued an order deferring further briefing until 90 days after the California Supreme Court issued its rulings in *People v. Moffett* and *People v. Gutierrez.*

In the fall of 2013, however, the superior court denied Wilson's petition. The order did not address any of the constitutional issues raised by Wilson in his petition. Instead, the court found that the enactment of Senate Bill No. 260, which added section 3051 to the Penal Code, created an administrative remedy for Wilson, making his constitutional claims moot. Wilson filed a motion for reconsideration. Wilson argued that Senate Bill No. 260 provided no remedy for him because he was sentenced to LWOP.[7]

---

[6] The California Supreme Court granted review in *Moffett* and *Gutierrez* to consider the constitutionality of section 190.5, the statute pursuant to which Wilson had been sentenced, in light of *Miller,* and to decide whether the individual sentencing considerations announced in *Miller* should apply to imposition of sentences under section 190.5. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1360 ["We granted review to determine whether a presumption in favor of a sentence of life without parole under section 190.5(b) violates the Eighth Amendment to the United States Constitution under the principles announced in *Miller*."].) As discussed elsewhere here, the California Supreme Court filed its opinion in *Moffett* and *Gutierrez* in May 2014. (*Ibid.*)

[7] Under section 3051 of the Penal Code minors sentenced to determinate term of years or a life term have an opportunity to prove their rehabilitation and secure release on parole after serving a prescribed term of confinement. Senate Bill No. 260, codified as section 3051, provides an opportunity for a juvenile offender to be released on parole irrespective of the sentence imposed by the trial court by requiring the Board of Parole Hearings to conduct "youth offender parole hearings" (Sen. Bill No. 260 (2013–2014 Reg. Sess.) ch. 312, § 4, p. 7) to consider the release of juvenile offenders sentenced to prison for specified crimes. It provides for a youth offender parole hearing during the 15th year of incarceration for a prisoner serving a determinate sentence (§ 3051, subd. (b)(1)), a hearing during the 20th year of incarceration for a prisoner serving a life term less than 25 years to life (§ 3051,

The court denied Wilson's motion for reconsideration.

## *DISCUSSION*

Wilson argues that his LWOP sentence must be vacated and that he is entitled to resentencing. He asserts that his sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment in light of the Supreme Court's recent opinion in *Miller,* where the Supreme Court held that a mandatory LWOP sentence for a juvenile convicted of homicide offenses is unconstitutional, and that a sentencing court must consider individual considerations before imposing an LWOP sentence on a juvenile.

The Attorney General disagrees, and also argues that section 1170, subdivision (d)(2) provides a remedy for juveniles with LWOP sentences. In addition, the Attorney General raises several threshold arguments unrelated to the merits. Specifically, the Attorney General contends that Wilson's habeas petition should be summarily denied because it was filed too late; and that *Miller* does not apply to Wilson's case because *Miller*'s holding and analysis does not warrant retroactive application.

## I. Timeliness of Wilson's Habeas Petition

The Attorney General asserts that Wilson's petition should be rejected because it was filed 15 years after the judgment became final in the case, and almost a year after *Miller* was filed. The Attorney General also points out that in Wilson's 1998 direct

---

subd. (b)(2)), and a hearing during the 25th year of incarceration for a prisoner serving a life term of 25 years to life (§ 3051, subd. (b)(3)). Section 3051, subdivision (f)(1) requires that any psychological evaluations and risk assessment instruments be administered by a licensed psychologist employed by the board and that the evaluations and instruments "take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (§ 3051, subd. (f)(1).) Section 3051 exempts from its provisions inmates who were sentenced pursuant to the three strikes law (§§ 667, subds. (b)-(i), 1170.12), the Chelsea King Child Predator Prevention Act of 2010 (formerly and more commonly known as Jessica's Law) (§ 667.61), or "to life in prison without the possibility of parole" (§ 3051, subd. (h)).

The Attorney General has conceded that section 3051 does not provide a remedy for Wilson or moot his petition because it excludes individuals such as Wilson who are serving LWOP sentences.

8

appeal, Wilson asserted an unsuccessful challenge to his sentence as cruel and unusual punishment in violation of the Eighth Amendment.

In general a petition for a writ of habeas corpus must be filed "as promptly as the circumstances allow." (*In re Clark* (1993) 5 Cal.4th 750, 765, fn. 5.) Nonetheless, neither the Legislature nor the Supreme Court has established an express time limit within which a petitioner must seek habeas relief (*In re Huddleston* (1969) 71 Cal.2d 1031, 1034), although any significant delay in seeking collateral relief must be fully justified. (*In re Nunez* (2009) 173 Cal.App.4th 709, 723.) Delay is measured from the time a petitioner knew, or reasonably should have known, the information in support of the claim and the legal basis for the claim. (*In re Huddleston, supra,* 71 Cal.2d at p.1034.) Indeed, "[a] defendant could not be expected to raise at the time of his conviction points of law which had not yet been pronounced." (*Ibid*.; *In re Caffey* (1968) 68 Cal.2d 762, 773.)

Wilson's petition is not untimely. The arguments that Wilson asserts in his petition regarding the constitutionality of his LWOP sentence were not legally viable prior to 2012 when the Supreme Court decided *Miller*. In addition, the *Miller* Court announced new sentencing considerations for juveniles based on scientific research and insights that were developed after Wilson's original sentencing. Although some of the age-based sentencing considerations addressed in *Miller* are included in section 190.3 (and existed when Wilson was sentenced), *Miller* relied on the new scientific information to expand the list of those considerations and recalibrate the weight they should be given by a sentencing court.

We also conclude that Wilson's 10-month delay in filing his habeas petition after *Miller* became final does not justify the rejection of his claims. (See *In re Huddleston, supra,* 71 Cal.2d at p. 1034 [concluding a lapse of two and one-half years between discovery of the ground to seek relief and filing of the petition does not amount to an unreasonable delay].) Given the length of time Wilson has been in prison and the dormancy of his case since his conviction was affirmed in 1998, the fact that it took him a

number of months to find appellate counsel and to prepare and file a petition is not unreasonable.

## II.    The Constitutionality of Juvenile LWOP Sentences

In his petition, Wilson argues that his LWOP sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment in view of recent Eighth Amendment jurisprudence.

### A.    Eighth Amendment in the Context of Sentencing Juveniles

The Eighth Amendment guarantees that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)  The right not to be subjected to excessive sanctions "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" (*Roper v. Simmons* (2005) 543 U.S. 551, 560.)  To determine whether a punishment is cruel or unusual in violation of the Eighth Amendment, "courts must look beyond historical conceptions to '"the evolving standards of decency that mark the progress of a maturing society."' [Citations]." (*Graham v. Florida* (2010) 560 U.S. 48, 58.)  "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment.  The standard itself remains the same, but its applicability must change as the basic mores of society change.'" (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419.)

In the context of juvenile offenders, the Supreme Court in *Miller* held that the Eighth Amendment forbids sentences of non-discretionary, mandatory life imprisonment without the possibility of parole for individuals who were under the age of 18 at the time they committed a homicide offense. (*Miller v. Alabama, supra,* 567 U.S. __, 132 S.Ct. 2455.)  Although the Court did not categorically bar the punishment of life imprisonment without parole for minors, it determined that the sentencing court must consider the offending minor's age and youthful characteristics before imposing such a sentence. (*Id.*

at pp. 2467, 2471.)[8]  Concerned with proportionality of punishment, the Court looked to two lines of precedent to reach this result.  (*Id.* at p. 2463.)

The first line of cases held the Eighth Amendment bar against cruel and unusual punishment categorically banned sentencing practices resulting in divergence between the culpability of a class of offenders and the severity of the penalty imposed.  (*Miller v. Alabama, supra,* 567 U.S. __, 132 S.Ct. 2455, citing *Graham v. Florida, supra,* 560 U.S. at pp. 61-62 [holding unconstitutional a sentence of life imprisonment without parole for a minor who committed a non-homicide offense]; *Atkins v. Virginia* (2002) 536 U.S. 304 [holding the execution of intellectually disabled defendants unconstitutional]; *Roper v. Simmons, supra,* 543 U.S. 551 [holding the execution of individuals who were under 18 years of age at the time of their capital crimes unconstitutional]; *Kennedy v. Louisiana* (2008) 554 U.S. 407 [holding unconstitutional the death penalty for non-homicide offenses].)  Evaluating these cases, the Supreme Court concluded that "children are different from adults for the purposes of sentencing" in a number of ways.  "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking.  [Citation.]  Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings.  [Citation.]  And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'  [Citation.]"

---

[8]      Two petitioners were before the Supreme Court in *Miller*.  Evan Miller – who was convicted of capital murder committed when he was 14 years old and sentenced to life in prison without possibility of parole – was before the Court on direct appeal from the Alabama Court of Criminal Appeals, which had affirmed his conviction and sentence. (*Miller v. State* (Ala. Crim.App.2010) 63 So.3d 676, cert. denied, No. 1091663 (Ala. Oct. 22, 2010).  Kuntrell Jackson – who was convicted of capital felony murder and aggravated robbery also committed at the age of 14 years and sentenced to life in prison without the possibility of parole – was before the Court on collateral review, after the Arkansas Supreme Court affirmed the dismissal of his state habeas petition by the Arkansas Circuit Court.  (*Jackson v. Norris* (Ark.2011) 378 S.W.3d 103.)

11

(*Miller v. Alabama, supra,* 567 U.S. __, 132 S.Ct. at p. 2464.)  For these reasons, "juveniles have diminished culpability and greater prospects for reform," and are thus "'less deserving of the most severe punishments.'  [Citation.]" (*Id.* at pp. 2464-2465.)[9]

 *Miller* then looked to a second line of cases requiring individualized decision-making in capital punishment cases.[10]  The *Miller* Court then applied this jurisprudence to the imposition of life imprisonment on juveniles by reasoning that a life imprisonment without parole sentence for a juvenile is tantamount to a death sentence for an adult. (*Miller v. Alabama, supra,* 567 U.S. ___, 132 S.Ct. at p. 2463-2464.)  Because the Eighth Amendment when applied to adults requires individualized sentencing prior to the imposition of a death sentence, the Eighth Amendment when applied to juveniles requires individualized sentencing prior to the imposition of a sentence of life imprisonment without parole.  (*Ibid.*)

---

[9] The *Miller* Court also observed: "Our decisions [in *Roper* and *Graham*] rested not only on common sense – on what 'any parent knows' – but on science and social science as well.  [Citation.]  In *Roper*, we cited studies showing that '"[o]nly a relatively small proportion of adolescents"' who engage in illegal activity '"develop entrenched patterns of problem behavior."'  [Citation.]  And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds' – for example, in 'parts of the brain involved in behavior control.' [Citation.]  We reasoned that those findings – of transient rashness, proclivity for risk, and inability to assess consequence – both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his '"deficiencies will be reformed."'  [Citation.]" (*Miller v. Alabama*, *supra,* 567 U.S. at pp. __–__, 132 S.Ct. at pp. 2464–2465, fn. omitted.)  "The evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger." (*Miller v. Alabama*, *supra*, at 567 U.S. at p. __, fn. 5, 132 S.Ct. at p. 2464, fn. 5; see *ibid*. ["'It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance'"].)

[10] The "second line" of precedents cited in *Miller* are *Woodson v. North Carolina* (1976) 428 U.S. 280 and *Lockett v. Ohio* (1978) 438 U.S. 586.

The *Miller* Court summarized the individual sentencing factors (the *Miller* factors) that are the critical features of individualized sentencing for juveniles: (1) the "chronological age" of the youth and the hallmark features of youth, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the "family and home environment" that surrounded the youth and from which the youth cannot usually extricate him or herself; (3) "the circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected [the juvenile]"; (4) the evidence or information in the record as to whether the offender might have been charged or convicted of a lesser offense but for the "incompetencies associated with youth – for example, [the juvenile's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the juvenile's] incapacity to assist [the juvenile's] own attorneys"; and (5) "the possibility of rehabilitation" along with the extent or absence of a criminal history. (*Miller v. Alabama, supra,* 567 U.S. at p. ___, 132 S.Ct. at p. 2468.)

Taking into account "the confluence of these two lines of precedent" – which establish that juvenile offenders are less culpable and more susceptible to reform than adults, and that imposition of the harshest punishment on a juvenile requires individualized sentencing that takes into account an offender's "youth (and all that accompanies it)" – the *Miller* Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller v. Alabama, supra,* 567 U.S. at pp. __, __, 132 S.Ct. at pp. 2464, 2469.)[11]

The *Miller* Court also cautioned: "[G]iven all we have said in *Roper, Graham*, and this decision about children's diminished culpability and heightened capacity for change,

_____

[11] The *Miller* Court did not consider the petitioners' "alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." (*Miller v. Alabama, supra,* 567 U.S. at p. __, 132 S.Ct. at p. 2469.)

13

we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller v. Alabama, supra,* 567 U.S. at pp. __, __, 132 S.Ct. at pp. 2464, 2469.)

Following *Miller*, the California Supreme Court had the opportunity to determine the application of *Miller*'s analysis to California's sentencing scheme for juvenile offenders. (*People v. Gutierrez, supra,* 58 Cal.4th 1354.) Specifically, the *Gutierrez* Court considered the constitutionality of section 190.5,[12] which had long been interpreted by the California appellate courts as creating a presumption in favor of LWOP as the appropriate penalty for juveniles convicted of homicide offenses. (*People v. Gutierrez, supra,* 58 Cal.4th at p. 1360.) *Gutierrez* expressly disapproved the line of cases that had interpreted section 190.5 as establishing a presumption in favor of LWOP sentences for juvenile offenders holding "that section 190.5(b) confers discretion on the sentencing court to impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole." (*Id.* at p. 1387.)

In addition, *Guiterrez* held that a sentencing court, in exercising its discretion under section 190.5, must consider all relevant evidence, including the "*Miller* factors," bearing on the "distinctive attributes of youth" and how those attributes "diminish the

---

[12]     Section 190.5, subdivision (b) provides that the penalty for 16- or 17-year-old juveniles who commit special circumstance murder "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5.)

14

penological justifications for imposing the harshest sentences on juvenile offenders." (*People v. Gutierrez, supra,* 58 Cal.4th at p. 1390.)[13]

### B. Retroactive Application of *Miller*

Wilson seeks the benefit of the application of the principles announced in *Miller* and applied in *Gutierrez*. Because Wilson's LWOP sentence was imposed and the judgment in his case became final 15 years before *Miller* was decided, Wilson is entitled to be resentenced only if the principles announced in *Miller* apply retroactively to cases that became final prior to its pronouncement.

### 1. Test for Retroactivity

In *Teague v. Lane* (1989) 489 U.S. 288, the Supreme Court set forth the test for determining when a new rule of constitutional law will be applied to cases on collateral review. The *Teague* Court explained that "[r]etroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." (*Id.* at p. 300.) According to *Teague*, "new rules should always be applied retroactively to cases on direct review, but . . . generally they should not be applied retroactively to criminal cases on collateral review." (*Id.* at p. 303.) The Court reasoned that collateral review is not designed as a substitute for direct review and that the government has a legitimate interest in having judgments become and remain final. (*Ibid.*)

The *Teague* Court articulated two exceptions to the general rule of nonretroactivity for new rules in cases on collateral review. First, a new rule should be applied retroactively if it "places 'certain kinds of primary, private individual conduct

---

[13] Direct appeals in *Gutierrez* and *Moffett* were pending when *Miller* was decided by the United States Supreme Court. Because the defendants in *People v. Gutierrez* and *People v. Moffett* were sentenced prior to *Miller* in accord with the prevailing interpretation of section 190.5 which included the presumption in favor of LWOP sentences, the California Supreme Court remanded the two cases for resentencing in light the principles set forth in *Miller* and *Gutierrez*. (*People v. Gutierrez, supra,* 58 Cal.4th at p. 1361.)

beyond the power of the criminal law-making authority to proscribe.'" (*Teague, supra,* 489 U.S. at p. 307.) Second, a new rule should be applied retroactively if it "requires the observance of 'those procedures that . . . are "implicit in the concept of ordered liberty."'" (*Ibid.*) Thus "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." (*Id.* at p. 310.)

In *Schriro v. Summerlin* (2004) 542 U.S. 348, the Supreme Court revisited *Teague*'s retroactivity analysis. The *Schriro* Court defined the key distinction in the retroactivity analysis as whether the new rule is substantive or procedural.

*Schriro* held that substantive rules apply retroactively, and include those rules that (1) narrow the scope of a criminal statute by interpreting its terms or (2) "alter the range of conduct or the class of persons covered by the statute and place them beyond the State's power to punish." (*Schriro, supra*, 542 U.S. at pp. 351-342.) Included within the second category are rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Such rules apply retroactively because they carry a "'significant risk'" that a defendant stands convicted of "'an act that the law does not make criminal'" or "faces a punishment that the law cannot impose upon him." (*Id.* at p. 352.) The Court explained that although it had sometimes referred to rules of this type as "falling under an exception to *Teague*'s bar on retroactive application of procedural rules, . . . they are more accurately characterized as substantive rules not subject to the bar." (*Id.* at p. 352, f n. 4.)

The Court further explained that new "rules of procedure" generally do not apply retroactively because they do not produce a class of persons convicted on conduct that the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. The Court found that because of the speculative connection to innocence, retroactive effect is only given to a small set of "watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding. (*Schriro, supra,* 542 U.S. at p. 352.)

16

This class of rules is extremely narrow; a watershed rule is one "without which the likelihood of an accurate conviction is seriously diminished."[14] (*Ibid.*)

In applying the "substantive/procedural" dichotomy announced in *Schriro,* courts have included within the substantive category categorical bans, such as rules forbidding imposition of the death sentence on persons with intellectual disabilities or on juveniles. (See *Penry v. Lynaugh* (1889) 492 U.S. 302, 330, *abrogated on other grounds*; *Atkins v. Virginia* (2002) 536 U.S. 304; *Roper v. Simmons, supra,* 543 U.S. 551.) The Court has treated the rule forbidding life imprisonment for a juvenile convicted of a nonhomicide offense as a substantive rule (see *Graham v. Florida, supra,* 560 U.S. at pp. 61-62), as it has a decision that modifies the elements of an offense because new elements alter the range of conduct the statute punishes, rendering some formerly unlawful conduct lawful or vice versa. (See *Bousley v. United States* (1998) 523 U.S. 614, 620-621.)

In the sentencing context, the Court has found a number of rules to be procedural. *Schriro* considered whether the rule announced in *Ring v. Arizona* (2002) 536 U.S. 584 – that a jury, and not a judge, had to find an aggravating circumstance necessary for imposition of the death penalty – applied retroactively to cases on collateral review. *Schriro* held this rule was procedural, noting it merely "altered the range of permissible methods for determining whether a defendant's conduct is punishable by death." (*Schriro, supra,* 542 U.S. at p. 353.) The Court noted that rules that "allocate decisionmaking authority in this fashion are prototypical procedural rules" but stated: "This Court's holding that, because [a state] has made a certain fact essential to the death penalty, that fact must be found by a jury, is not the same as this Court's making a certain

---

14    The Court further observed that the watershed class of rules is extremely narrow, and that it is unlikely that any has yet to emerge. "In providing guidance as to what might fall within this exception, [the Court] has repeatedly referred to the rule of *Gideon v. Wainwright* (1963) 372 U.S. 335 [right to counsel] and only to this rule." (*Schriro v. Summerlin, supra,* 542 U.S. at p.352.) As the Court observed in *Beard v. Banks* (2004) 542 U.S. 406, 417, "it should come as no surprise that we have yet to find a new rule that falls under the second *Teague* exception."

fact essential to the death penalty.  The former was a procedural holding; the latter would be substantive." (*Id.* at p. 354.)

In state courts, the Supreme Court has held that the *Teague/Schriro* retroactivity analysis applied in federal habeas actions is not binding when deciding issues of retroactivity under state law. (*Danforth v. Minnesota* (2008) 52 U.S. 264, 276.)  A state court is "'free to choose the degree of retroactivity or prospectivity which [it] believe[s] appropriate to the particular rule under consideration, so long as [it] give[s] federal constitutional rights at least as broad a scope as the United States Supreme Court requires.'" (*Ibid.*)  Thus, states can give broader effect to new rules than is required by the *Teague/Schriro* test.[15]

### 2.    Application of *Teague/Schriro* to *Miller*

To determine whether a new rule applies retroactively to a petitioner's conviction on collateral review, the Court has set forth a three-step approach; at a minimum, courts must: (1) determine the date petitioner's judgment of conviction became final; (2) "'[s]urve[y] the legal landscape as it then existed,' and 'determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution'" (quoting *Saffle v. Parks*(1990) 494 U.S. 484, 488); and (3) decide whether one of the two exceptions to nonretroactivity apply. (*Caspari v. Bohlen* (1994) 510 U.S. 383, 390; citations omitted.)

---

[15]    The California Supreme Court has also acknowledged its authority to give greater retroactive impact to a decision than the federal courts. (See *In re Gomez* (2009) 45 Cal.4th 650, 653 [applying *Teague* and concluding *Cunningham v. California* (2007) 549 U.S. 270 applied on collateral review to judgments final before it was decided].) Nonetheless, because, as we shall explain, we conclude that *Teague/Schriro* require the retroactive application of *Miller* in the present case, we need not conduct a separate analysis.  Similarly, our conclusion that the principles announced in *Miller* should be applied here renders unnecessary the consideration of the Attorney General's argument that this court should not apply *Gutierrez* retroactively in this case.

18

Here the parties agree that *Miller* announced a new rule, satisfying the second prong. A "new rule" is defined as a rule that was not dictated by precedent existing at the time the defendant's conviction became final. (*Whorton v. Bockting* (2007) 549 U.S. 406, 416.) Indeed, the rule announced in *Miller* was not dictated by precedent existing at the time the judgment in Wilson's case became final in 1998. Rather, *Miller* relied heavily on *Graham,* decided in 2010 and *Roper*, decided in 2005. As a result, we look to the third step: is *Miller* either a substantive or procedural rule?[16] No published opinion of a court in California has resolved the question of retroactivity of *Miller*.[17]

### a. Retroactive Application of *Miller* in Other Jurisdictions

Other jurisdictions have considered the retroactive application of *Miller*, with mixed results. The primary issue in these cases is whether the rule announced in *Miller* is substantive or procedural.

Courts that have determined the rules announced in *Miller* are procedural focus specifically on language in *Miller* that "'[o]ur decision does not categorically bar a penalty for a class of offenders or type of crime.'" These courts reason that *Miller* simply "altered the range of permissible methods" for determining whether a juvenile could be sentenced to life imprisonment without parole. (See *State v. Tate* (2013) 130 So.3d 829, 837 [Louisana State Supreme Court]; *Commonwealth v. Cunningham* (2013) 81 A.3d 1, 10 [Pennsylvania Supreme Court]; *Malvo v. Mathena* (E.D. Va. Nov. 12, 2014) 2014 WL

---

[16] Because we conclude that rules announced in *Miller* are substantive we do not analyze whether *Miller* falls within the *Teague* exception for a "watershed" rule of criminal procedure.

[17] Earlier this year in *In re Rainey* (2014) 224 Cal.App.4th 280, the First District Court of Appeal held that *Miller* announced new substantive rules and therefore applied retroactively to cases on collateral review. However, the Supreme Court granted a petition for review in *Rainey.* (*In re Rainey* (2014) __ Cal.4th __, 326 P.3d 251 (S217567).) In granting review, the Court ordered briefing deferred pending decision in *In re Alatriste* (S214652) and *In re Bonilla* (S214960) which included the issue: "Does *Miller* apply retroactively on habeas corpus to a prisoner who was a juvenile at the time of the commitment offense and who is presently serving a sentence that is the functional equivalent of life without the possibility of parole?"

2808805 [slip opinion]; *In re Morgan* (11th Cir. 2013) 713 F.3d 1365, 1367; *Craig v. Cain* (5th Cir. 2013) No. 12-30035, 2013 WL 69128, at *1–2 ["*Miller* does not satisfy the test for retroactivity because it does not categorically bar all sentences of life imprisonment for juveniles; *Miller* bars only those sentences made mandatory by a sentencing scheme. Therefore, the first *Teague* exception does not apply."], citations omitted; *Thompson v. Roy* (D.Minn. 2014) No. 13-cv-1524, 2014 WL 1234498; *Chambers v. State* (Minn. 2013) 831 N.W.2d 311, 328-329; *People v. Carp* (Mich.Ct.App. 2012) 828 N.W.2d 685, 709-710 [The *Miller* Court indicated that its ruling was procedural in nature, stating "it mandates only that a sentencer follow a certain process – considering an offender's youth and attendant characteristics – before imposing a particular penalty"].) Overall, this line of precedent concludes that because *Miller* did not categorically ban a type of punishment for a class of offenders or type of crime, as the Court did in *Roper* and *Graham*, but instead modified the procedures to implement such a sentence, the rule must be procedural.

A number of other jurisdictions have determined that the rule announced in *Miller* is substantive. (See, e.g., *Ex parte Maxwell* (Tex.Crim.App. 2014) 424 S.W.3d 66, 75 ["We conclude that [the *Miller* rule] is a 'new substantive rule' that puts a juvenile's mandatory 'life without parole' sentence outside the ambit of the State's power."; italics deleted]; *Nebraska v. Mantich* (Neb. 2014) 842 N.W.2d 716, 730 ["In essence, *Miller* 'amounts to something close to a de facto substantive holding,' because it sets forth the general rule that life imprisonment without parole should not be imposed upon a juvenile except in the rarest of cases where that juvenile cannot be distinguished from an adult based on diminished capacity or culpability."]; *Toye v. Florida* (Fla.Dist.Ct.App. 2014) 133 So.3d 540 [applying Florida's own retroactivity analysis, and not the *Teague* analysis]; *Diatchenko v. Dist. Attorney for Suffolk Dist.* (Mass. 2013) 1 N.E.3d 270, 281 ["The rule explicitly forecloses the imposition of a certain category of punishment – mandatory life in prison without the possibility of parole – on a specific class of defendants: those individuals under the age of eighteen when they commit the crime of murder."]; *People v. Davis* (2014) 6 N.E.3d 709, 722 ["*Miller* mandates a sentencing

20

range broader than that provided by statute for minors convicted of first degree murder who could otherwise receive only natural life imprisonment."], pet. for cert denied, *Illinois v. Davis* (2014) ___ U.S. ___, (Dec. 1, 2014 WL 4094821); *Jones v. Mississippi* (Miss. 2013) 122 So.3d 698, 702 ["Prior to *Miller*, everyone convicted of murder in Mississippi was sentenced to life imprisonment and was ineligible for parole. Following *Miller*, Mississippi's current sentencing and parole statutes could not be followed in homicide cases involving juvenile defendants. Our sentencing scheme may be applied to juveniles only after applicable *Miller* characteristics and circumstances have been considered by the sentencing authority. As such, *Miller* modified our substantive law by narrowing its application for juveniles."].)

The Supreme Court of Iowa in *State v. Ragland* (2013) 836 N.W.2d 107, 115-116 held: "From a broad perspective, *Miller* does mandate a new procedure. Yet, the procedural rule for [an individualized sentencing] hearing is the result of a substantive change in the law that prohibits mandatory life-without-parole sentencing. Thus, the case bars states from imposing a certain type of punishment on certain people. . . . 'Such rules apply retroactively because they "necessarily carry a significant risk that a defendant" . . . faces a punishment that the law cannot impose upon him.'" In reaching its conclusion, the *Ragland* Court also cited an article written by Professor Erwin Chemerinsky in which he asserted: "There is a strong argument that *Miller* should apply retroactively: It says that it is beyond the authority of the criminal law to impose a mandatory sentence of life without parole. It would be terribly unfair to have individuals imprisoned for life without any chance of parole based on the accident of the timing of the trial [¶] . . . [¶] . . . [T]he *Miller* Court did more than change procedures; it held that the government cannot constitutionally impose a punishment. As a substantive change in the law which puts matters outside the scope of the government's power, the holding should apply retroactively." (*State v. Ragland, supra*, 836 N.W.2d at p. 117, quoting Erwin Chemerinsky, *Chemerinsky: Juvenile Life-Without-Parole Case Means Courts Must Look at Mandatory Sentences*, A.B.A. J. Law News Now (Aug. 8, 2012).)

21

While the analysis used by these courts varies, most conclude that *Miller* altered the substantive law by broadening the range of punishment for juveniles convicted of homicide. Before *Miller*, under those state's laws, life without parole was mandatory and "automatic" for juveniles who committed homicide. (See, e.g., *Ex parte Maxwell, supra,* 424 S.W.3d 66, 70-75.) After *Miller*, life without parole remains possible in limited circumstances, but new outcomes and sentences are also available. (See, e.g., *ibid.*; *Jones v. Mississippi, supra,* 122 So.3d at p. 702.)

Courts have also reached differing conclusions as to how the procedural posture of *Miller* affects the retroactivity analysis. As noted elsewhere here, Kuntrell Jackson was before the Court on collateral review in the companion case to *Miller*. Jackson sought relief after a state court dismissed his application for a writ of state habeas corpus. In announcing the new rule in *Miller*, the Court made no distinction between the procedural postures of the two defendants. Instead, it simply reversed both of the lower court judgments and remanded the causes "for further proceedings not inconsistent with this opinion." (*Miller v. Alabama, supra*, 567 U.S. __, 132 S.Ct. at p. 2475.)

Several jurisdictions have concluded that the Court's equal treatment of the two defendants in *Miller* is a factor that must be considered in the retroactivity analysis. In *Ragland,* the Iowa Supreme Court noted that Jackson's case was remanded so that Jackson could be given an individualized sentencing hearing and reasoned that "[t]here would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review." (*State v. Ragland, supra,* 836 N.W.2d 107 at p. 116.) *Ragland* also noted that the dissent in *Miller* suggested the majority's decision would invalidate other cases across the nation and reasoned that the dissent would not have raised such a concern if the Court did not intend its holding to apply to cases on collateral review. The court in *Nebraska v. Mantich, supra,* 842 N.W.2d at page 731, observed "[w]e also find it noteworthy that the Court applied the rule announced in *Miller* to Jackson, who was before the Court on collateral review. . . . [W]e are not inclined to refuse to apply the rule announced in *Miller* to a defendant before us on collateral review when the Court has already applied the rule to a

22

defendant before it on collateral review." (See also *Diatchenko v. Dist. Attorney for Suffolk Dist., supra,* 1 N.E.3d at p. 281 ["Our conclusion is supported by the fact that in *Miller* . . . the Supreme Court retroactively applied the rule that it was announcing in that case to the defendant in the companion case who was before the Court on collateral review"]; *People v. Morfin* (2012) 981 N.E.2d 1010, 1022–1023 ["Our decision is reinforced by the fact that one of the two *Miller* defendants was before the United States Supreme Court on collateral review following completion of his direct appeal and received relief in the same manner as Miller himself."].) These decisions used the application of *Miller* to companion case petitioner Jackson before the Court on collateral review to bolster their conclusion that *Miller* announced a substantive rule, not subject to the bar in *Teague*.

Other jurisdictions, however, conclude the Court's treatment of Jackson is not a relevant factor in the retroactivity analysis. The Pennsylvania Supreme Court noted that it was not clear the retroactivity issue was before the *Miller* Court with respect to Jackson and that in the absence of a "specific, principled retroactivity analysis" by the Court, it would not deem the Court to have held the *Miller* rule applied retroactively just because the Court applied it to Jackson. (See *Commonwealth v. Cunningham, supra,* 81 A.3d at p. 9) Similarly, the Michigan appellate court in *Carp* reasoned that the "mere fact that the Court remanded Jackson for resentencing does not constitute a ruling or determination on retroactivity." (*People v. Carp, supra*, 828 N.W.2d at p. 712.) *Carp* further reasoned that the issue of retroactivity was not raised as to Jackson and thus the Court had no reason to address it. (*Ibid*.)

### b.    This Court's Resolution

Based on our review of the authority from other state and federal jurisdictions, we conclude that the rules announced in *Miller* are substantive. *Miller* did not simply change what entity considered the same facts, and did not simply announce a rule that was designed to enhance accuracy in sentencing. Rather, *Miller* held that the sentencing court must consider specific, individualized factors before handing down an LWOP sentence for a juvenile. Effectively, *Miller* requires the court to consider new specific facts before

imposing a life imprisonment sentence with no possibility of parole on a juvenile. Thus, the *Miller* holding does not only address the aspect of "how" the determination is made, it also defines the "what," i.e., the substantive limits of that determination.

In our view, it is significant that the *Miller* Court made no distinction in its decision between the collateral review afforded the defendant from Arkansas (Jackson) and the direct review afforded the defendant from Alabama (Miller). As the Iowa Supreme Court observed, "[t]here would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review." (*State v. Ragland, supra,* 836 N.W.2d at p. 116.) Indeed, long ago the United State Supreme Court stated that it would not announce or apply a new constitutional rule in a case before it on collateral review unless that rule would apply to all defendants on collateral review. (See *Penry v. Lynaugh, supra,* 492 U.S. at p. 330.) The Court adopted this policy to ensure that justice is administered evenhandedly. (*Ibid*; *Teague,* 489 U.S. at p. 300.) As a result, we are disinclined to refuse to apply the rules announced in *Miller* to a petitioner before us on collateral review when the Court has already applied the rule to a petitioner before it on collateral review. Evenhanded administration of justice is carried out only if Wilson, like Jackson, is entitled to the benefit of the new rule announced in *Miller*. As noted by the Supreme Court of Iowa, any other result would be "'terribly unfair.'" (*State v. Ragland, supra,* 836 N.W.2d at p. 116.)

Furthermore, the rules announced in *Miller* are akin to the type of rules the *Schriro* Court determined are new substantive rules: the Court made a certain fact (consideration of mitigating evidence) essential to imposition of a sentence of life imprisonment without parole. It imposed a new requirement as to what a sentencer must consider in order to constitutionally impose LWOP. *Miller* also recognized that when mitigating evidence is considered, a sentence of life imprisonment without parole for a juvenile should be rare. This is consistent with the underlying logic of *Miller,* based on *Graham,* that "'[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender

24

whose crime reflects irreparable corruption.'" (*Graham v. Florida*, *supra*, 560 U.S. at p. 73.) By setting forth the general rule that life imprisonment without parole should not be imposed upon a juvenile except in the rarest of cases where that juvenile cannot be distinguished from an adult based on diminished capacity or culpability, *Miller* has changed the determination. The requirement that the sentencing courts acknowledge and consider the differences between adults and juveniles in terms of brain development and social and emotional maturity, represents nothing short of a paradigm shift in the juvenile sentencing scheme. These new considerations have effectively recalibrated the balance of factors the courts apply during sentencing. Furthermore, in rejecting as unconstitutional mandatory LWOP sentences for juvenile homicide offenses, *Miller* significantly altered the size and composition of the class that would receive such a sentence in the future. In short, the *Miller* rule – prohibiting the imposition of an LWOP sentence on a juvenile offender absent a consideration of the juvenile's "chronological age and its hallmark features" – applies retroactively because it "'necessarily carr[ies] a significant risk that a defendant . . . faces a punishment that the law cannot impose upon him.'" (*Schriro, supra,* 542 U.S. at p. 352.)

In addition, we find it instructive that the two lines of cases relied upon by the Court in *Miller* to support its holdings have been applied retroactively on both direct and collateral review. (See *In re Sparks* (5th Cir.2011) 657 F.3d 258, 261-262 [indicating *Graham, Roper* and *Atkins* were made retroactive on collateral review by the Supreme Court]; see also *Tyler v. Cain, supra,* 533 U.S. at p. 669, 121 S.Ct. at p. 2486, 150 L.Ed.2d at pp. 646–647 (O'Connor, J., conc.) [describing the syllogistic relationship between *Teague*'s exception to nonretroactivity for rules placing certain conduct beyond the power of the state to proscribe and subsequent cases that fit into *Teague*'s exception]; *Songer v. Wainwright* (1985) 769 F.2d 1488, 1489 [noting that *Lockett v. Ohio* (1978) 438 U.S. 586, 604-605 ["[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a *mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"] has been given retroactive

25

effect]; original italics; *Penry v. Lynaugh, supra,* 492 U.S. at p. 330 ["[T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense"], *abrogated on other grounds by Atkins*, *supra,* 536 U.S. at p. 321.) The retroactive application of the authority underlying *Miller* supports our decision here.

Ultimately, we are persuaded that Wilson is entitled to the benefit of *Miller* because of the unfairness that would result from the contrary outcome. We find particularly troubling the apparent inequity that would arise if the prospect that an individualized, discretionary judicial determination of whether a juvenile murderer should be afforded parole eligibility would depend solely upon the happenstance of the precise moment that the defendant's conviction became final. No court that has rejected the retroactive application of *Miller* has advanced a rationale to resolve this inequity. Likewise, the Attorney General in this case does not address the issue.

Scientific insights and the development of the law have not always kept pace with the reality of peoples' daily lives. To be sure, our understanding of the cognitive, social and emotional development of juveniles and the effect of that maturation process on the conduct of minors has increased significantly in the 15 years since Wilson's judgment became final. Our legal system's recent recognition of the impact of that development on the culpability of juveniles is profound. In our view, justice is served if Wilson obtains the benefit of these insights. Reconciling science and the law with reality requires retroactive application of the *Miller* decision in this case. We, therefore, conclude that the rules announced in *Miller* should apply to Wilson.

### C.     The Merits – *Miller* **Applied Here**

Wilson contends he is entitled to habeas relief under *Miller* for several reasons. First, he asserts he was sentenced when the California courts applied the presumption of LWOP for any special circumstance murder committed by a juvenile. Second, Wilson maintains his sentence must be vacated because the trial court did not adequately

26

consider the distinctive mitigating circumstances of his youth and background, as required by *Miller*.

As to the first asserted ground for relief, a review of the transcript from the sentencing hearing does not support the conclusion the trial court presumptively imposed the LWOP sentence. Rather, the record indicates that the sentencing court understood it could choose to impose the lesser punishment of 25 years to life.

Nevertheless, we conclude Wilson is entitled to habeas relief on the second ground asserted. The record shows the sentencing judge imposed LWOP primarily based on the factors in aggravation, including that the crime involved great violence and bodily harm; that Wilson was armed; that the victim was in a vulnerable position; that Wilson was a leader; that Wilson was a participant in a planned robbery; and that the crime included an attempted taking of great monetary value. While the court did mention Wilson's age, absent from the court's sentencing discourse is a full consideration of the factors, now constitutionally mandated under *Miller,* related to "the distinctive attributes of youth [that] diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Miller v. Alabama, supra,* 567 U.S. ___132 S.Ct. at p. 2465.) Because *Miller* requires sentencing courts to consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (*id.* at p. 2469) and because the trial court here did not consider the "hallmark features" of youth now mandated under *Miller* (*id.* at p. 2468), we conclude habeas relief must be granted.

## III.    Section 1170, Subdivision (d)(2)

In reaching our conclusion, we also reject the Attorney General's contention that habeas relief should be denied because Wilson "now has the possibility of parole" under section 1170, subdivision (d)(2).

Section 1170, subdivision (d)(2) enacted in 2012, provides a "recall" procedure for a juvenile LWOP sentence, after a period of 15 years. (§ 1170, subd. (d)(2)(A)(i) ["When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the

27

possibility of parole has served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing."].) Section 1170, subdivision (d)(2), was enacted in response to *Roper* and *Graham*. (Assem. Comm. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as amended May 27, 2011.)

This legislation pre-dated the decision in *Miller*, but *Roper* and *Graham*, as we have discussed, were the analytical foundation for *Miller* and established the fundamental principle that the inherent attributes of youth must be considered before the court imposes the harshest of criminal penalties. The Legislature apparently believed this legislation rectified constitutional shortcomings of juvenile LWOP sentences under section 190.5, subdivision (b).

However, in *Gutierrez* the California Supreme Court rejected the Attorney General's argument that the enactment of section 1170, subdivision (d)(2) resolved the constitutional problems arising from the fact that California courts had interpreted section 190.5, subdivision (b) as creating a presumption for LWOP sentences for juveniles. The *Gutierrez* Court opined that: "the potential for relief under section 1170(d)(2) does not eliminate the serious constitutional doubts arising from a presumption in favor of life without parole under section 190.5(b) . . . ." (*People v.* Gutierrez, *supra,* 58 Cal.4th at p. 1385.) We agree.

In our view, section 1170, subdivision (d)(2), falls short of what *Miller* requires, even where no presumption was applied. First of all, *Miller* makes clear the special considerations attendant to youth are to be considered at the *time of sentencing*. As the *Gutierrez* Court observed: "*Miller* repeatedly made clear that the sentencing authority must address this risk of error by considering how children are different and how those differences counsel against a sentence of life without parole '*before imposing a particular penalty.*'" (*People v. Gutierrez, supra,* 58 Cal.4th at p. 1387*, quoting Miller v. Alabama, supra,* 567 U.S. at p. __, 132 S.Ct. at p. 2471, *italics added; see id.* at pp. __, __, 132 S.Ct. at pp. 2469, 2475.)

28

In addition, section 1170, subdivision (d)(2)'s petitioning process – at the earliest 15 years after sentencing – is inconsistent with the Supreme Court's analysis in *Miller*. Allowing the deferral of constitutionally mandated sentencing factors for a minimum of a decade and a half after conviction rather than requiring consideration of those facts before incarceration, effectively makes *Miller*'s mandate irrelevant to our sentencing courts. Nothing in *Miller* indicates that the Supreme Court envisioned any such deferral of constitutionally required sentencing considerations; that deferral stands in opposition to the Court's observation that such consideration will result in the harshest of sentences being "uncommon."

Moreover, there is no guarantee that a petition seeking recall and resentencing under section 1170, subdivision (d)(2), will be heard on the merits. Rather, a hearing is conditioned on the defendant "describing his or her remorse and work towards rehabilitation" and stating that one of the following four circumstances is true: (1) he or she "was convicted pursuant to felony murder or aiding and abetting murder provisions"; (2) he or she does not have other prior juvenile felony adjudications "for assault or other felony crimes with a significant potential for personal harm to victims"; (3) he or she "committed the offense with at least one adult codefendant"; or (4) he or she "has performed acts that tend to indicate rehabilitation or potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse." (§ 1170, subd. (d)(2)(B)(i)–(iv).) Nothing in *Miller* allows the conclusion that a juvenile must make a threshold showing of some sort before a sentencing court is constitutionally required to consider the implications of his or her youth. Indeed, as the court in *Gutierrez* reasoned: "it is doubtful that the potential to recall a life without parole sentence based on a future demonstration of rehabilitation can make such a sentence any more valid when it was imposed. If anything, a decision to recall the sentence pursuant to section 1170(d)(2) is a recognition that the initial judgment of incorrigibility

29

underlying the imposition of life without parole turned out to be erroneous." (*People v. Gutierrez, supra,* 58 Cal.4th at pp. 1386-1387.)

Furthermore, even when a section 1170, subdivision (d) petition is heard on the merits, the enumerated factors the court may consider in deciding whether to resentence the defendant are under-inclusive; they do not embrace the totality of the considerations the Supreme Court discussed in *Miller*, *Roper* and *Graham*. In addition to the factors relating to rehabilitation efforts, a court ruling on the merits of a recall petition may consider: whether, prior to the crime, the defendant "had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress" (§ 1170, subd. (d)(2)(F)(iv)); whether the defendant "suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense" (§ 1170, subd. (d)(2)(v)); whether the defendant "has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved in crime" (§ 1170, subd. (d)(2)(F)(vii)); and whether the defendant "has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor" (§ 1170, subd. (d)(2)(F)(viii)).

These factors describe organic, foundational elements of criminal conduct: lack of parental supervision or positive adult role models, and mental or physical impairment. Absent from the list of factors is the fundamental fact of youth, and its attendant attributes, on which the Supreme Court has focused – "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing." (*Miller v. Alabama, supra,* 567 U.S. ___,132 S.Ct. at p. 2464.) Youth, the Court has said, "'is more than a chronological fact.' . . . It is a time of immaturity, irresponsibility, 'impetuousness[,] and recklessness.'" (*Id.* at pp. 2467, 2468; citations omitted.) As a result, "a sentencer misses too much if he treats every child as an adult." (*Id.* at p. 2468.) Finally, although section 1170, subdivision (d)(2)(I), provides that a court hearing a recall petition "may" also "consider any other criteria that the court deems relevant to its

30

decision," this proviso neither identifies, nor requires the court to consider, the inherent "mitigating qualities of youth" which the Supreme Court has instructed must be considered before imposing an LWOP sentence on a juvenile. (*Miller v. Alabama, supra,* 567 U.S. __, 132 S.Ct. at p. 2467.)

In view of the foregoing, we conclude section 1170, subdivision, (d)(2) does not eliminate the constitutional concerns with Wilson's sentence, and it does not comport with the holding in *Miller*. Therefore it does not provide Wilson with an adequate remedy.

## VI. Other Claims

In Wilson's habeas petition he also argued that (1) his LWOP sentence violated the California Constitution's prohibition on cruel and unusual punishment; (2) the trial court in sentencing him improperly considered an aggravating fact (i.e., evidence that Wilson "pistol-whipped the victim"); and (3) "the principles of *Graham* and *Miller* categorically bar LWOP for a juvenile offender such as Wilson, who neither killed nor specifically intended to kill."[18]

Because we find Wilson is entitled to be resentenced under the dictates of *Miller*, we do not reach these additional arguments about his original sentence. If on remand, Wilson is resentenced to LWOP, he is of course free to assert a new challenge based on the circumstances of, and facts and evidence presented during, his new sentencing proceeding.

---

[18] Whether the principles of *Miller* and *Graham* impose a categorical ban to the imposition of LWOP sentences for juveniles who did not personally kill or intend to kill was raised in *Miller* in the concurring opinion of Justice Breyer, joined by Justice Sotomayor. (*Miller v. Alabama, supra,* 567 U.S. ___, ___, 132 S.Ct. at pp. 2475-2477.) In our view, Justice Breyer's concurrence raises important questions about the application of Eight Amendment to situations such as the one before us. We observe, however, that no court has followed or adopted Justice Breyer's analysis, and we need not decide the issue in light of our conclusion here.

## *DISPOSITION*

The petition for habeas corpus is granted. Petitioner's LWOP sentence is vacated and the matter is remanded for resentencing.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**                    **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.